## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ERIC COOPER, *as Personal Representative of the Estate of Michael Dudley Cooper, Deceased*, | ) ) ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs*. | ) | Case No. 18-cv-1060-BJ |
| | ) | |
| (1) KESTO SIMPSON, *individually*; (2) The City of Walters, *a municipal corporation*; (3) KENT SIMPSON, *individually and in his official capacity, and*; (4) JOHN DOES 1-10, *individually*, | ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

---

## DEFENDANT COTTON COUNTY SHERIFF'S
## MOTION FOR SUMMARY JUDGMENT

---

GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.

James L. Gibbs, II (OBA #15689)
Seth D. Coldiron (OBA #20041)
701 N. Broadway Ave., Suite 400
Oklahoma City, Oklahoma 73102
Telephone: (405) 524-2400
Facsimile: (405) 525-6004

jgibbs@gphglaw.com
scoldiron@gphglaw.com

*Attorneys for Defendant,*
*Sheriff of Cotton County, Okla.*

November 30, 2020

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................ 2

III. STANDARD OF REVIEW .................................................................................. 9

IV. ARGUMENTS AND AUTHORITIES ................................................................... 10

    A.    SHERIFF'S NIGHTTIME EXECUTION THE WARRANT DID NOT VIOLATE
           THE FOURTH AMENDMENT OR OKLAHOMA LAW. ....................................... 12

           *1.    Although executed at night, the search was valid under
                the Fourth Amendment and Oklahoma law.* ................................... 12

           *2.    The nighttime search did not violate Dudley's
                constitutional or civil rights.* ........................................................ 16

           *3.    Sheriff never implemented a policy that authorized
                unlawful entry into homes or sanctioned excessive
                force.* .............................................................................................. 20

    B.    SHERIFF WAS NOT DELIBERATELY INDIFFERENT TO DUDLEY'S
           MEDICAL NEEDS. .................................................................................... 22

           *1.    Sheriff was not personally involved with the assessment
                of Dudley's emergent medical need.* ............................................... 24

           *2.    Sheriff's actions or inactions did not delay Dudley's
                access to medical care.* .................................................................. 25

           *3.    Sheriff did not implement a policy that was deliberately
                indifferent of Dudley's medical needs.* ........................................... 28

V. CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

## *CASES*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................... 9, 10

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*,
520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) ................................ 29

*Blackmon v. Sutton*,
734 F.3d 1237 (10th Cir. 2013) ........................................................................ 22

*Cardoso v. Calbone*,
490 F.3d 1194 (10th Cir. 2007) ........................................................................ 10

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986) ............ 9

*Childress v. City of Arapaho*,
210 F.3d 1154 (10th Cir. 2000) ........................................................................ 12

*City of St. Louis v. Praprotnik*,
485 U.S. 112,, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) .................................. 24

*Connick v. Thompson*,
563 U.S. 51, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) .................................. 29

*Cox. v. Glanz*,
800 F.3d 1231 (10th Cir. 2015) .................................................................. 22, 23

*Estate of Hammers v. Douglas Cty., Kan. Bd. of Comm'rs*,
303 F. Supp. 3d 1134 (D. Kan. 2018) .......................................................... 23, 24

*Estate of Hocker by Hocker v. Walsh*,
22 F.3d 995 (10th Cir. 1994) ............................................................................ 30

*Estelle v. Gamble*,
429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ...................................... 22

*Farmer v. Brennan*,
511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) .......................... 22

*Filgueras v. State*,
1983 OK CR 128, 668 P.2d 1172 ...................................................................... 19

*Kay v. State*,
1983 OK CR 121, 668 P.2d 1150 ...................................................................... 19

*Kendall v. Watkins*,
998 F.2d 848, 850 (10th Cir. 1993) .................................................................... 9

*Kentucky v. Graham*,
473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) .................................................. 10

*King v. Glanz*,
Case No. 12-CV-137-JED-TLW, 2014 WL 2838035 (N.D. Okla. June 23, 2014) .... 20, 21

*Lopez v. LeMaster*,
172 F.3d 756 (10th Cir. 1999) ..................................................................................... 22

*Mata v. Saiz*,
427 F.3d 745 (10th Cir. 2005) ..................................................................................... 22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .................................................. 10

*Mocek v. City of Albuquerque*,
813 F.3d 912 (10th Cir. 2015) ................................................................................ 10, 11

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) .................................... 10, 20, 23, 24

*O'Rourke v. City of Norman*,
875 F.2d 1465 (10th Cir. 1989) ..................................................................................... 17

*Panther v. State*,
1981 OK CR 163, 637 P.2d 1267 ..................................................................................... 19

*Pierce v. Gilchrist*,
359 F.3d 1279 (10th Cir. 2004) ..................................................................................... 12

*Poolaw v. Marcantel*,
565 F.3d 721 (10th Cir. 2009) ................................................................................ 13, 14

*Rigg v. City of Lakewood*,
37 F. Supp. 3d 1207 (D. Colo. 2014) ............................................................................. 29

*Schneider v. City of Grand Junction Police Dep't*,
717 F.3d 760 (10th Cir. 2013) .................................................... 11, 23, 24, 26, 28

*United States v. Moten*,
118 Fed. Appx. 412 (10th Cir. 2004) ............................................................................. 18

*United States v. Randle*,
196 Fed. Appx. 676 (10th Cir. 2006) .......................................................... 13, 14, 15, 19

*Waller v. City & Cty. of Denver*,
932 F.3d 1277 (10th Cir. 2019) ..................................................................................... 11

## STATUTES

Civil Rights Act of 1871, 42 U.S.C. § 1983 .......................................... 1

OKLA. STAT. tit. 19, § 131(A) ............................................................ 24

OKLA. STAT. tit. 22, § 1230 ......................................... 12, 14, 15, 16, 18, 19, 30

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII ..................................................................... 1

U.S. Const. amend. XIV, § 2 ............................................................... 1

**DEFENDANT COTTON COUNTY SHERIFF'S
MOTION FOR SUMMARY JUDGMENT**

Defendant Sheriff of Cotton County, Oklahoma ("Sheriff"), moves this Court, pursuant to FED. R. CIV. P. 56 and LCvR 56.1, for summary judgment against Plaintiff Eric Cooper's ("Cooper's"), personal representative of the Estate of Michael Dudley Cooper, deceased ("Dudley"), remaining claims.[1]  In support, Sheriff would show this Court:

## I.
## INTRODUCTION

On October 29, 2018, Cooper brought this action against Sheriff, Officer Kesto Simpson ("Officer Simpson"), a police officer with Defendant City of Walters ("Walters"), and John Does 1-10, individually.[2]  Cooper avers that Sheriff, among others, violated Dudley's civil and constitutional rights guaranteed by the U.S. CONST. amends. IV and XIV, § 2, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.[3]  On December 4, 2018, Sheriff moved to dismiss Cooper's claim for punitive damages.  *See*, Def. Kent Simpson's Mot. to Dismiss (Doc. #005) (Dec. 4, 2018) at 1-5.  On December 27, 2018, this Court

---

[1] On March 5, 2020, the Court substituted "The Sheriff of Cotton County in his Official Capacity" for claims asserted against Kent Simpson in his official capacity since he was no longer sheriff.  *See*, Order (Doc. #058) (Mar. 5, 2020) at 1. **Note:** Sheriff incorporates all pleadings, referenced herein by the ECF/CM pagination. FED. R. CIV. P. 10(c).

[2] *See*, Pl.'s Compl. (Doc. #001) (Oct. 29, 2018) at 1-2, ¶¶1-5.

[3] *See id*., at 7-9, ¶¶35-43 (asserting in his second cause of action a failure to provide medical care claim pursuant to the Fourteenth Amendment and § 1983); *id*. at 11-12, ¶¶53-57 (asserting in his fourth cause of action that Sheriff is liable for the alleged "unlawful entry" into Dudley's residence in addition to reasserting his claim for failure to provide Dudley with medical care).

entered an Order granting Sheriff's motion. *See*, Order (Doc. #010) (Dec. 27, 2018) at 1. Sheriff now seeks summary judgment against Cooper's remaining claims.

## II.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    On or about March 9, 2018, Sheriff investigated a burglary and discovered that Donna Devine ("Devine") and Louis B. Slomba ("Slomba") had visited the residence of Sadie Teakell ("Sadie") when Ricky Crank ("Crank") and Ronnie Heath Teakell ("Heath") asked Slomba for a ride to Tony Defate's ("Defate's") residence. *See*, Affidavit for Search Warrant ("Simpson Aff.") (Mar. 10, 2018) at COTTON 002 attached as "**Exhibit 1**."

2.    Slomba agreed to give Crank and Heath a ride, and the quartet proceeded to Devine's residence, where she exited the vehicle, and the trio of Slomba, Crank, and Heath continued toward Defate's house but, along the way, Crank asked Slomba to pull over to the side of the road where he and Heath loaded items of stolen property into Slomba's vehicle. *See*, Ex. 1, Simpson Aff. at COTTON 002.

3.    Crank and Heath then directed Slomba to drive to Defate's home, but when they arrived Defate was not at home, and Crank and Heath went to the neighbor, Kenneth Jay ("Jay"), to ask him if he wanted to buy some guns, which Jay agreed to purchase. *See*, Ex. 1, Simpson Aff. at COTTON 002.

4.    Slomba then drove Crank and Heath back to Devine's residence, but  Devine did not want them there, and Slomba drove Devine, Crank, and Heath back to Sadie's house

where Crank and Heath unloaded the stolen property, including loaded rifles, a laptop, jewelry, and a compound bow. *See*, Ex. 1, Simpson Aff. at COTTON 002.

5.      On March 10, 2018, Officer Simpson was off duty when he received a phone call around 9:43 pm from Sheriff, his father, who informed him of his investigation and asked for his assistance in executing a search warrant. *See*, Deposition of Kesto Simpson (Jul. 17, 2020) at 27:15-25, 28:1-25, 35:1-22 attached as "**Exhibit 2**."

6.      Officer Simpson agreed to contact Walters PD's Chief, Tommy Stranahan ("Chief Stranahan"), to coordinate Walters PD assistance in executing the warrant, which Chief Stranahan approved. *See*, Ex. 2, Kesto Simpson Dep. at 25:21-23, 36:14-25, 37:1-13, 38:5-17.

7.      Thereafter, Sheriff called Officer Simpson, again, explaining that he was on his way to get the warrant signed by Judge Michael Flanagan, the Associate District Judge of Cotton County. *See*, Ex. 2, Kesto Simpson Dep. at 39:2-25, 40:4-10; *and see*, Deposition of Michael Flanagan (Jul. 8, 2020) at 7:8-13 attached as "**Exhibit 3**".

8.      About 11:40 pm, Sheriff presented an affidavit attesting to the information obtained through his investigation to Judge Flanagan and requested a search warrant for Sadie's property. *See*, Ex. 3, Flanagan Dep. at 18:10-18, 20:13-25, 21:1-16.

9.      Sheriff requested authorization to search Sadie's residence "at any time of day or night," and Judge Flanagan recalled issuing the search warrant, which is, also, dated March 10, 2018, contemporaneously with his execution of Sheriff's affidavit sometime around or shortly after 11:41 pm. *See*, Ex. 1, Simpson Aff. at COTTON 003; Ex. 3,

Flanagan Dep. at 27:8-25, 28:1-17; *and see*, Search Warrant (Mar. 10, 2018) at COTTON 001 attached as "**Exhibit 4**."

10.     Although the warrant did not specifically authorize a night-time search, Judge Flanagan understood Sheriff sought approval for a nighttime search since his affidavit requested authorization to perform the search at any time of day or night. *See*, Ex. 1, Simpson Aff. at COTTON 003; Ex. 3, Flanagan Dep. at 40:1-25, 41:-20, 48:5-25, 49:1-23; Ex. 4, Search Warrant at COTTON 001.

11.     Judge Flanagan understood from Sheriff's affidavit that Crank was the potential burglary suspect and that Crank had agreed to sell, if not already sold, two guns to Jay. *See*, Ex. 1, Simpson Aff. at COTTON 002-3; Ex. 3, Flanagan Dep. at 30:13-25, 31:1-25, 33:17-23, 34:6-25, 35:1-12, 37:5-21, 39:5-23, 41:21-25, 42:1-3; Ex. 4, Search Warrant at COTTON 001.

12.     Judge Flanagan believed it was reasonable for Sheriff to have concluded that he had authorized a nighttime search because the warrant was executed after 10 pm and there was an emergent need to find the stolen property. *See*, Ex. 1, Simpson Aff. at COTTON 002-3; Ex. 3, Flanagan Dep. at 34:15-25, 35:1-12, 37:5-21, 39:5-23, 46:13-21, 94:3-15; Ex. 4, Search Warrant at COTTON 001.

13.     Judge Flanagan knew that one of the stipulations for executing a nighttime warrant was the transfer or hiding of stolen property, and he believed that Sheriff's affidavit, which alleged that Crank had already agreed to sell or sold two guns to Jay, satisfied this exception. *See*, Ex. 1, Simpson Aff. at COTTON 002; Ex. 3, Flanagan Dep. at 34:6-25, 35:1-12, 39:5-23.

14.	Around 11:30 pm, Officer Simpson met Sheriff, Officer Benjamin Lehew ("Lehew"), and Officer Teague Liming ("Liming") in the parking lot at the Sheriff's Office where Officer Lehew devised a plan sketching out a diagram for execution of the warrant while Sheriff warned them that Sadie, Crank, Dudley, and Heath were potentially inside and the situation could be dangerous. *See*, Ex. 2, Kesto Simpson Dep. at 46:15-25, 47:1-15, 50:10-18, 52:12-25, 53:1-20, 61:3-6, 65:6-22; *and see*, Benjamin Lehew Deposition (Jul. 8, 2020) at 17:4-25, 24:5-25, 25:1-23 attached as "**Exhibit 5**."

15.	Sometime shortly after midnight, each officer and Sheriff drove separately to Sadie's residence. *See*, Ex. 2, Kesto Simpson Dep. at 68:4-10; Ex. 5, Lehew Dep. at 33:21-25, 34:1, 43:16-19.

16.	Officer Lehew drove around to the back of the home through an alley, where he parked his patrol car, grabbed his shotgun, jumped the fence, positioned himself in the backyard, and radioed that he was in position, and, shortly thereafter, Officer Liming radioed that he was in position at the front of the house. *See*, Ex. 2, Kesto Simpson Dep. at 69:4-6; Ex. 5, Lehew Dep. at 31:12-14, 36:1-25, 37, 38:1, 39:24-25, 40, 41:1-22.

17.	Sheriff and Officer Simpson, who had also arrived, parked their vehicles in front of the house and proceeded through the front yard past a car port to the outbuilding behind the house where they knocked on the door announced that they were law enforcement executing a warrant but no one was inside. *See*, Ex. 2, Kesto Simpson Dep. at 69:21-25, 70:1-2, 71:1-18, 72:9-25, 73:1-24, 74:8-23, 75:11-14.

18.	Thereafter, Sheriff and Officer Simpson returned to the front of the house where Officer Liming was waiting in the front yard and approached the front door where

Sheriff and Officer Simpson knocked and announced their presence, and Crank opened the door to let them in. *See*, Ex. 2, Kesto Simpson Dep. at 75:18-20, 77:3-25, 78:14-25, 79-81, 82:1.

19.     Officer Lehew remained in the backyard until the scene was secure and did not hear or see their entry into the home. *See*, Ex. 5, Lehew Dep. at 42:6-25.

20.     Once Crank opened the front door, Officer Simpson saw him, Sadie, and Dudley in the living room, but a sheet hung over a doorway to the kitchen concealed his view into the back of the house. *See*, Ex. 2, Kesto Simpson Dep. at 82:7-18.

21.     As Officer Simpson, Officer Liming, and Sheriff entered the home, Officer Simpson announced, "search warrant," and commanded Crank to get on the ground, but Crank stepped backward, so he repeated the command until Crank cooperated. *See*, Ex. 2, Kesto Simpson Dep. at 82:24-25, 83, 84:1-9, 86:2-25.

22.     Officer Simpson then turned toward Sadie and Dudley, who were sitting on a couch along the wall adjacent to the front door, and, again, announced, "search warrant," while commanding them to get on the ground, at which point Sadie complied but Dudley did not. *See*, Ex. 2, Kesto Simpson Dep. at 87:2-25, 88:11-25, 89:1-14.

23.     When Officer Simpson attempted to grab his wrist, Dudley pulled away, but, thereafter, he succeeded in taking Dudley's left wrist with his left hand while using his open right hand to press against the back of Dudley's left arm pulling him onto the floor, but Dudley did not break his fall and landed chest first on the floor. *See*, Ex. 2, Kesto Simpson Dep. at 91:5-25, 99:9-25, 100, 101:1-6, 103:17-25, 104-107, 108:1-7, 110:8-23.

24.     Officer Simpson handcuffed Dudley.  *See*, Ex. 2, Kesto Simpson Dep. at 108:14-23.

25.     Meanwhile, Sheriff handcuffed Crank, and Officer Liming handcuffed Sadie. *See*, Ex. 2, Kesto Simpson Dep. at 113:5-15.

26.     Thereafter, Sheriff and Officer Liming proceeded with searching the residence while Officer Simpson remained in the living room observing Sadie, Crank, and Dudley.  *See*, Ex. 2, Kesto Simpson Dep. at 114:21-25, 115:1-4.

27.     Dudley continued to move about on the floor, adjusting, trying to get comfortable but did not speak.  *See*, Ex. 2, Kesto Simpson Dep. at 117:3-20.

28.     Shortly thereafter, Sheriff and Officer Liming returned to the living room to report that the kitchen and back of the house were clear of any other occupants, and Officer Simpson grabbed Dudley's left arm and placed him back on the couch while Officer Liming helped Sadie to the couch, and Sheriff placed Crank on a chair.  *See*, Ex. 2, Kesto Simpson Dep. at 116:21-25, 117:1-2, 118:8-21, 119:9-23, 121:24-25, 122:1-5 & 20-23.

29.     When Sheriff and Officer Liming left the house to continue the search, Dudley verbally complained to Officer Simpson that his cuffs were too tight and leaned forward so that Officer Simpson could check them, but Officer Simpson did not believe the handcuffs were too tight, told Dudley this, and left the handcuffs on him.  *See*, Ex. 2, Kesto Simpson Dep. at 125:1-10; 126:8-25, 127:1-18.

30.     Dudley did not have any visible signs of injury and his body movements were controlled, but Officer Simpson recognized that he moved slowly or appeared lethargic. *See*, Ex. 2, Kesto Simpson Dep. at 125:20-25, 126:1-7.

31.     Officer Lehew, who remained outside, had hopped back over the fence, put his shotgun in his car, and drove around to the front of the residence where he waited in the front yard.  *See*, Ex. 2, Kesto Simpson Dep. at 127:16-25, 128:1-23; Ex. 5, Lehew Dep. at 47:8-17, 52:18-25, 53:9-14 & 25, 54:1-4.

32.     About this time, Officer Simpson noticed that Dudley stopped moving, so he placed his hand on Dudley's shoulder and called out his name, but Dudley did not respond although he was breathing.  *See*, Ex. 2, Kesto Simpson Dep. at 130:23-25, 131-133, 134:1-4, 154:2-11.

33.     Officer Simpson, who did not have his radio with him, stepped out onto the front porch when he saw Officer Lehew approaching and asked him to call an ambulance. *See*, Ex. 2, Kesto Simpson Dep. at 130:8-17, 134:15-25, 135:1-24.

34.     At 12:35 am, Officer Lehew called dispatch on his cell phone, requested emergency medical services ("EMS"), and then entered the house where he did not check Dudley's vitals or attempt to render any first aid but photographed Dudley, Sadie, and Crank as well as other areas of the house. *See*, Ex. 2, Kesto Simpson Dep. at 135:25, 136:1-12, 141:4-22; Ex. 5, Lehew Dep. at 55:25, 56-60, 61:1-15, 64:13-25, 65:1-8, 70:18-20, 78:16-25, 79:7-25, 80:7-25, 81:1-24.

35.     Around 12:48 am, the ambulance arrived.  *See*, Ex. 2, Kesto Simpson Dep. at 144:5-21; Ex. 5, Lehew Dep. at 72:10-22.

36.     Sheriff and Officer Liming continued to search the property, and Officer Simpson did not speak with them.  *See*, Ex. 2, Kesto Simpson Dep. at 160:17-24; Ex. 5, Lehew Dep. at 78:2-15; 92:19-24.

37.     EMS began life saving measures and transported Dudley to Comanche County Memorial Hospital.  *See*, Ex. 2, Kesto Simpson Dep. at 156:2-25, 157:1-11; Ex. 5, Lehew Dep. at 85:16-25, 86:1-5, 93:11-13.

38.     The next morning, Sadie went to the hospital where Dudley was in the Intensive Care Unit, and Dr. Mark Duncan informed her that Dudley was brain dead. *See*, Deposition of Sadie Teakell (Jun. 4, 2020) at 74:6-25, 75-76, 77:1-7, 203:12-25 attached as "**Exhibit 6**."

39.     Sadie remained by Dudley's side until he was removed from life support and died, two (2) days later, on March 12, 2018.  *See*, Ex. 6, Teakell Dep. at 77:24-25, 78:1-6.

40.     At all relevant times, Sheriff maintained a policy on "Securing and Service of Search Warrants" protecting the subject's constitutional and civil rights, which Sheriff complied with by obtaining the warrant and conducting the search of Sadie's property in conformity therewith. *See*, Cotton County Sheriff's Office Policy, Securing and Service of Search Warrants ("Policy") (Nov. 1, 2010) at COTTON 051-54 attached as "**Exhibit 7**."

### III.
### STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.[4]  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

---

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Anderson v. Liberty Lobby, Inc.* (herein "*Liberty Lobby*"), 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[5] "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … where the records taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"[6]

## IV.
## ARGUMENTS AND AUTHORITIES

Cooper claims that Sheriff is liable for "unlawfully" executing the warrant and failing to provide medical care to Dudley. *See*, Pl.'s Compl. (Doc. #001) at 11, ¶54. "A suit against a government officer in his official capacity is a suit against the entity of which an officer is an agent."[7] "A local governing body may be sued under § 1983 only where 'the action that is alleged to be unconstitutional implements or executes a policy statement,

---

[5] *Celotex Corp.*, 477 U.S. at 317.

[6] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355–56, 89 L. Ed. 2d 538 (1986) (citations omitted); *Cardoso v. Calbone*, 490 F.3d 1194, 1997 (10th Cir. 2007) (same); *see also*, *Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff").

[7] *Kentucky v. Graham*, 473 U.S. 159, 164–65, 105 S. Ct. 3099, 3104, 87 L. Ed. 2d 114 (1985) (footnote, citations omitted).

ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[8]  "A municipality is not liable solely because its employees caused injury."[9]

"Instead, 'the government as an entity' may only be held liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"[10]  "Rather, a plaintiff asserting a § 1983 claim must show '1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.'"[11]

Cooper's theories, as they relate to Sheriff, are deficient because the warrant satisfied the requirements of both Oklahoma law and Fourth Amendment, Sheriff was not personally involved in Dudley's medical care, and Sheriff never implemented any policy that violated Dudley's rights.  In short, Cooper has not shown, and cannot show, that Sheriff deliberately violated Dudley's constitutional or civil rights.

---

[8] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035–36, 56 L. Ed. 2d 611 (1978)) (footnote omitted).

[9] *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) (quoting *Graves v. Thomas,* 450 F.3d 1215, 1218 (10th Cir. 2006)); *and* see, *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036 ("[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory") (italics in *Monell*).

[10] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037-38).

[11] *Mocek*, 813 F.3d at 933 (quoting *Graves,* 450 F.3d at 1218); *and see*, *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (The three elements of a *Monell* claim are "(1) official policy or custom, (2) causation, and (3) state of mind").

## A. SHERIFF'S NIGHTTIME EXECUTION THE WARRANT DID NOT VIOLATE THE FOURTH AMENDMENT OR OKLAHOMA LAW.

Cooper contends that Sheriff violated Dudley's Fourth Amendment rights by his "unlawful entry" into the home.[12] "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting under color of state law."[13] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[14] "To state a claim under the Fourth Amendment, plaintiffs must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'"[15]

### 1. Although executed at night, the search was valid under the Fourth Amendment and Oklahoma law.

Cooper contends that Sheriff violated Dudley's Fourth Amendment rights by his "unlawful" entry into the home at night when the warrant did not authorize a nighttime search in violation of OKLA. STAT. tit. 22, § 1230.[16] "To be valid under the Fourth Amendment, the warrant to search [… a] residence must meet three requirements: (1) it must have been 'issued by [a] neutral, disinterested magistrate[ ]'; (2) 'those seeking the warrant must [have] demonstrate[d] to the magistrate their probable cause to believe that

---

[12] *See id.* at 3-4, 11, ¶¶11-14, 54.

[13] *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (quoting 42 U.S.C. § 1983).

[14] U.S. CONST. amend. IV.

[15] *Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 599, 109 S. Ct. 1378, 1383, 103 L. Ed. 2d 628 (1989)).

[16] *See*, Pl.'s Compl. (Doc. #001) at 3-4, 11, ¶¶11-14, 54.

the evidence sought [would] aid in a particular apprehension or conviction for a particular offense'; and (3) the warrant must 'particularly describe the things to be seized, as well as the place to be searched.'"[17]

The first and third requirements are satisfied. In his affidavit, Sheriff stated that the information was based upon his investigation of a suspected second-degree burglary, a felony, which occurred on March 9, 2018 in Cotton County. He identified Crank as a suspect. Sheriff described how Crank and Heath loaded the stolen property, including loaded guns among other items, into Slomba's vehicle and, later, how they unloaded those stolen items at Sadie's home. Further, Sheriff's affidavit incorporated an attached list describing each specific item. Moreover, Judge Flannagan, an independent judge, issued the warrant. Thus, the warrant satisfied the first and third Fourth Amendment requirements.

The issue, then, is whether the warrant established the second element: probable cause. "Probable cause for a search warrant exists when 'the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched.'"[18] "Probable cause is 'a determination based on common

---

[17] *Bowling v. Rector*, 584 F.3d 956, 969 (10th Cir. 2009) (quoting *Dalia v. United States*, 441 U.S. 238, 255, 99 S. Ct. 1682, 1692, 60 L. Ed. 2d 177 (1979) (first alteration added, remaining alterations, citations, and internal quotations in *Bowling*).

[18] *United States v. Randle*, 196 Fed. Appx. 676, 678 (10th Cir. 2006) (Tymkovich, J.) (Hartz, Ebel, JJ., concurring) (unpublished Order and J.) (quoting *United States v. Harris*, 369 F.3d 1157, 1165 (10th Cir. 2004) (quoting *United States v. Hernandez–Rodriguez,* 352 F.3d 1325, 1330 (10th Cir. 2003)); *and see*, *Poolaw v. Marcantel*, 565 F.3d 721, 729 (10th Cir. 2009), *as amended* (July 24, 2009) ("In determining whether probable cause exists to issue a warrant, the issuing judge must decide whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be

sense' and, therefore, is entitled to 'great deference' by a reviewing court."[19]  Courts will uphold a warrant if the issuing judge had a "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing."[20]  "Issues relating to the weight of the evidence, credibility of witnesses, and related inferences are the province of the district court and will not be disturbed."[21]  However, a court may not "arrive at probable cause simply by piling hunch upon hunch."[22]  Courts assess the validity of the warrant "on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [judge]," looking both at the facts that support probable cause and those that militate against it.[23]

---

found in a particular place") (quoting *United States v. Grimmett,* 439 F.3d 1263, 1270 (10th Cir. 2006) (quotations omitted in *Poolaw*); then citing *United States v. Harris,* 369 F.3d 1157, 1165 (10th Cir. 2004) ("Probable cause exists when the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched") (quotations omitted in *Poolaw*)).

[19] *Randall*, 196 Fed. Appx. at 678 (citing *United States v. Finnigin,* 113 F.3d 1182, 1185 (10th Cir. 1997)); *and see*, *Poolaw*, 565 F.3d at 728 ("We pay great deference to the probable cause determination made by the judge who issued the warrant") (citing *United States v. Perrine,* 518 F.3d 1196, 1201 (10th Cir. 2008)).

[20] *Poolaw*, 565 F.3d at 728–29 (10th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331, 76 L. Ed. 2d 527 (1983) (quotations omitted and alteration in *Poolaw*); then citing *Grimmett,* 439 F.3d at 1268)); *see also*, *Randle*, 196 Fed. Appx. at 678 ("the court's role is generally limited to determining whether the issuing magistrate judge had a 'substantial basis' for finding probable cause") (citing *Harris*, 369 F.3d at 1165).

[21] *Randall*, 196 Fed. Appx. at 678 (citing *United States v. Avery,* 295 F.3d 1158, 1167 (10th Cir. 2002)).

[22] *Poolaw*, 565 F.3d at 729 (quoting *United States v. Valenzuela,* 365 F.3d 892, 897 (10th Cir. 2004)).

[23] *Id*. (quoting *Maryland v. Garrison*, 480 U.S. 79, 85, 107 S. Ct. 1013, 1017, 94 L. Ed. 2d 72 (1987) (footnote omitted and alteration in *Poolaw*); then citing *Wilkins v. DeReyes,* 528 F.3d 790, 802 (10th Cir. 2008); *Valenzuela,* 365 F.3d at 897).

In addition to these general probable cause requirements, Oklahoma law includes a presumption against nighttime service.[24] "OKLA. STAT. tit. 22, § 1230 requires that search warrants for occupied dwellings be served only between the hours of 6 a.m. and 10 p.m., unless one of the following three conditions is satisfied: (1) the evidence is located at the premises to be searched only between 10 p.m. and 6 a.m.; (2) the search at issue is a crime scene search; or (3) the affidavits are (a) certain that the property is on the person or in the place to be searched, and (b) a judge finds there is a likelihood that the property named in the warrant will be moved, concealed, or destroyed if nighttime service is not authorized."[25]

Sheriff's affidavit satisfies the third condition.[26] He described how Crank and Heath loaded the stolen items into Slomba's vehicle before either agreeing to sell or selling two (2) rifles to Jay and returning to Sadie's home to unload the remainder of the stolen property. Sheriff was positive that the remaining stolen property, including rifles, a laptop, jewelry, and a compound bow were located at Sadie's residence. Sheriff presented his affidavit and requested the warrant after 10 pm, which Judge Flanagan interpreted as requesting authorization to conduct the search that night rather than waiting to obtain the warrant and conduct the search the following day.

---

[24] *Randle*, 196 Fed. Appx. at 679.

[25] *Id.*, 196 Fed. Appx. at 679 n. 2 (quoting 22 O.S. § 1230 (1996)) (noting that the statute has since been amended to include a fourth condition for a nighttime search related to the manufacture of methamphetamine or other controlled substance); *and see*, 22 O.S. § 1230(4) (2005).

[26] *See*, 12 O.S. § 1230(3).

Sheriff's affidavit satisfied the requirements of § 1230: (1) it unambiguously describes the stolen property to be seized, and (2) it provided a basis for Judge Flanagan to find a likelihood that the stolen property would be moved, concealed, or destroyed. As to the first requirement, Sheriff's affidavit plainly states that the Crank and Heath unloaded the stolen property into a shed behind Sadie's residence. As to the second requirement, Sheriff's affidavit lays out numerous corroborating facts, including witness testimony that Crank and Heath agreed to sell rifles to Jay. In addition, Sheriff requested "authorization to serve the same at Day or Night." Sheriff had probable cause for requesting the warrant, and Judge Flanagan considered those facts when issuing the warrant just before midnight on March 10, 2018.

### 2. *The nighttime search did not violate Dudley's constitutional or civil rights.*

Cooper claims that the warrant and search violated Oklahoma law, and, therefore, Sheriff's execution of the warrant violated his constitutional rights under the Fourth Amendment.[27] The problem with this theory is that the Fourth Amendment does ***not*** prohibit nighttime searches and, even if the search violated Oklahoma law (although it did not), a violation of state law does not equate to a constitutional violation.

Judge Flannagan, an Oklahoma judge, issued the warrant on Sheriff's application for it. The warrant was returnable to Judge Flannagan. Sheriff with the assistance of Walters PD officers executed the warrant and conducted the search in Walters, Cotton

---

[27] *See*, Pl.'s Compl. (Doc. #001) at 3-4, 11, ¶¶11-14, 54 (citing 22 O.S. § 1230).

County, Oklahoma. Thus, the issuance of the search warrant and the execution of it concern Oklahoma law.[28]

Under such circumstances, the warrant and affidavits need only conform to federal constitutional requirements.[29] "The essential inquiry when faced with challenges under the Fourth Amendment is whether the search or seizure was reasonable—reasonableness is analyzed in light of what was reasonable at the time of the Fourth Amendment's adoption."[30] However, the Supreme Court has never held that the Fourth Amendment prohibits nighttime searches.[31] As the Fourth Circuit explained:

> Unlike the simple knock-and-announce requirement, the appropriate time for a search of a home is not amenable to a universal rule. The same privacy interest exists night and day, every day, and the Fourth Amendment knows no holidays. What differs is how individuals experience intrusions on that privacy. Some people work at night and sleep by day, and others value most highly the privacy of the daytime. The intrusion on privacy during some daytime activities would undoubtedly be even more burdensome than a

---

[28] *United States v. Gibbons*, 607 F.2d 1320, 1325 (10th Cir. 1979).

[29] *Id*. (citing *United States v. Millar*, 543 F.2d 1280, 1283 (10th Cir. 1976) ("If a search is a state search, with minimal or no federal involvement, the warrant need only to conform to federal constitutional requirements …"); *United States v. Bedford*, 519 F.2d 650, 653 (3d Cir. 1975) ("the warrant need only satisfy federal constitutional requirements rather than those of state law, which may involve stricter standards. … The test is whether the fourth amendment's imperatives have been observed"), *cert. denied*, *Bedford v. United States*, 424 U.S. 917, 96 S. Ct. 1120, 47 L. Ed. 2d 323 (1976)) (additional citation omitted).

[30] *O'Rourke v. City of Norman*, 875 F.2d 1465, 1472 (10th Cir. 1989) (holding the nighttime search of family home when executing a daytime bench warrant for the arrest of the homeowner's emancipated teenage daughter who was held in contempt of court, an offense defined in Oklahoma as *sui generis*, violated the Fourth Amendment's prohibition against unreasonable searches and seizures) (citations omitted).

[31] *United States v. Rizzi*, 434 F.3d 669, 675 (4th Cir. 2006); *and see*, *United States v. Gibbons*, 607 F.2d 1320, 1326 n. 12 (10th Cir. 1979) (noting that the Fourth Amendment explicitly sets out the requirements for a valid warrant but "[t]here is, however, no specific provision on the time of day during which the warrant must be executed").

nighttime intrusion. For example, execution of a warrant during a family dinner on Thanksgiving day or during the celebration of a wedding might be considered more intrusive than a routine nighttime execution of a warrant at 10:30 p.m. But every search burdens the peace, privacy, and personal convenience of persons in their homes because police intrusion into the close of the home is inherently burdensome. For that reason, the Constitution provides the fundamental protection—night and day—that a search of a home can be conducted only with the authority of a warrant issued on probable cause (with exceptions not here relevant), and even then it must be conducted reasonably.[32]

The existence of a minimum constitutional protection, however, does not deny legislatures the power to provide additional, more nuanced protections. *Id.* Oklahoma's legislature has done so by prohibiting nighttime searches.[33] However, legislatures are, also, free to make exceptions.[34] Again, Oklahoma's statute lists four exceptions to its general prohibition against nighttime searches.[35] In other words, "Night searches are not unreasonable, *per se*," especially, in Oklahoma.[36]

Cooper has not advanced any legal authority that the Fourth Amendment prohibits the execution of a search warrant at night under ***all*** circumstances. The Tenth Circuit has made clear that "[a] state-law violation does not ... necessarily rise to the level of a federal

---

[32] *Id.*, 434 F.3d at 675.

[33] *See*, 22 O.S. § 1230.

[34] *Rizzi,* 434 F.3d at 675.

[35] *See*, 22 O.S. § 1230(1)-(4).

[36] *United States v. Moten*, 118 Fed. Appx. 412, 415 (10th Cir. 2004) (unpublished) ("A night-time execution of a search warrant is one, of many, factors to be considered in connection with a determination as to whether the search is reasonable") (citing *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir. 1979) ("This element of a nighttime intrusion is one element in considering the reasonableness of the search").

constitutional violation" under the Fourth Amendment.[37]  Indeed, "the question ... is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment."[38]  While Cooper relies upon § 1230 to establish the prohibition against nighttime searches, he ignores the exceptions.[39] "Oklahoma law only requires the issuing judge to find a 'likelihood' that the evidence will be moved, concealed or destroyed."[40]  Sheriff included allegations in his affidavit sufficient to support this conclusion. He described how Crank and Heath had already sold Jay two rifles.  It is therefore logical to assume that Crank and Heath were likely to continue disposing of the stolen property.

The warrant not issued in violation of § 1230.  Even if the warrant violated § 1230 (which it did not), this would still fail to establish a constitutional violation since the

---

[37] *Bowling*, 584 F.3d at 966 (quoting *United States v. Gonzales,* 535 F.3d 1174, 1182 (10th Cir. 2008)).

[38] *Id.* (quoting *Cooper v. State of Cal.*, 386 U.S. 58, 61, 87 S. Ct. 788, 790, 17 L. Ed. 2d 730 (1967)).

[39] *See*, Pl.'s Compl. (Doc. #001) at 3-4, ¶¶11-14 (citing 22 O.S. § 1230).

[40] *Id*; *and see*, *Figueras v. State*, 1983 OK CR 128, 668 P.2d 1172, 1173–74 (execution of search warrant at day or night was proper exercise of judicial discretion in accord with statute where affidavits contained information sufficient to establish that stolen property could be moved or concealed); *Kay v. State*, 1983 OK CR 121, 668 P.2d 1150, 1152 (finding warrant for service at any time of day or night did not violate statute even though affidavit did not indicate that marijuana would be quickly destroyed, moved, or concealed since there was a likelihood that appellant could have destroyed, moved, or concealed it); *Panther v. State*, 1981 OK CR 163, 637 P.2d 1267, 1269 (finding no abuse of discretion in issuing warrant directing search to be conducted day or night where affidavit alleged appellant had a source for getting rid of stolen property, which supported that the stolen property might be disposed of quickly).

warrant complied with the Fourth Amendment's requirements.[41] Put another way, Cooper cannot establish a Fourth Amendment violation by merely alleging a violation of § 1230.

### 3. Sheriff never implemented a policy that violated Dudley's constitutional or civil rights.

Assuming for purposes of argument that a Fourth Amendment violation occurred (although it did not), the next issue is whether the alleged violation was caused by a government policy or custom. Cooper contends that Sheriff is liable for the unconstitutional acts that he caused or authorized.[42] A government policy or custom may be manifested either in the acts of "its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."[43] Cooper has not established any policy or custom of unlawfully executing nighttime warrants.

Cooper must provide evidence of a practice that is "so permanent and well settled as to constitute a custom or usage with the force of law," that amounted to deliberate indifference to the rights of persons and was the moving force behind the violation.[44] "In order to establish a custom, the actions must be 'persistent and widespread.'"[45] Cooper has

---

[41] See, Bowling, 584 F.3d at 966; Gibbons, 607 F.2d 1320, 1325; Rizzi, 434 F.3d at 675.

[42] See, Pl.'s Compl. (Doc. #001) at 11, ¶55.

[43] Monell, 436 U.S. at 694, 98 S. Ct. at 2037–38 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

[44] King v. Glanz, Case No. 12-CV-137-JED-TLW, 2014 WL 2838035, at *2 (N.D. Okla. June 23, 2014) (Dowdell, J.) (unpublished Order and Op.) (citing Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir.1996).

[45] Id. (citing Lankford, 73 F.3d at 286).

not presented any evidence of a "custom" that violated Dudley's constitutional or civil rights. Cooper does not identify any persistent, widespread, permanent, or well-settled practice of executing warrants at night, which is required to establish a "custom" for municipal liability under § 1983.[46] The only incident that Cooper identifies involves Officer Simpson's treatment of Dudley on the night in question. This fails to establish a custom. "Consistent with the plain meaning of 'custom,' proof of an isolated incident does not show a custom."[47]

Moreover, Sheriff had a formal policy regarding the execution of warrants directed toward protecting Dudley's constitutional and civil rights. *See*, Ex. 7, Policy at COTTON 051-54. Both the warrant and Sheriff's search complied with policy. *See id*. at 53, ¶B.2 (permitting nighttime service). Judge Flannagan issued the warrant. *See id*. at 52, ¶A.4. Sheriff was present when executing the warrant. *See id*. at 53, ¶B.1. Chief Stranahan approved execution of the warrant, and Walters PD officers assisted in executing it. *See id*. at 53, ¶B.4. Sheriff and the Officers knocked and announced their presence when serving the warrant. *See id*. at 53, ¶¶B.2, B.5. Only those items identified in Sheriff's affidavit and authorized to be seized by the warrant were confiscated. *See id*. at 53, ¶B.6.

Again, Cooper's problem is that there is no meaningful evidence as to how, specifically, Sheriff's policy violated the constitution. Instead, Cooper insists that this single incident involving Dudley establishes a custom. One instance is not enough. Even

---

[46] *See*, *Glanz*, 2014 WL 2838035, at *2.

[47] *Id*. (citing *Lankford*, 73 F.3d at 286; *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993)) (footnote omitted).

if Cooper could establish a Fourth Amendment violation (which he cannot), he still cannot show that Sheriff implemented a policy that violated Dudley's constitutional rights. Sheriff is entitled to summary judgment against Cooper's "unlawful entry" claim.

### B. SHERIFF WAS NOT DELIBERATELY INDIFFERENT TO DUDLEY'S MEDICAL NEEDS.

Cooper also asserts Sheriff failed to respond to Dudley's emergent medical needs by delaying his access to medical care.[48] A prison official's deliberate indifference to a prisoner's "serious medical needs" constitutes cruel and unusual punishment in violation of the Eighth Amendment.[49] Dudley was, at most, a pre-trial detainee, which invokes the Fourteenth Amendment's Due Process Clause.[50] Thus, Cooper's claims "must be judged against the 'deliberate indifference to serious medical needs' test."[51]

Deliberate indifference has both an objective and subjective component.[52] "The objective inquiry concerns 'whether the harm suffered rises to a level 'sufficiently serious'

---

[48] *See*, Pl.'s Compl. (Doc. #001) at 5, 8 & 11, ¶¶25-27, 37-40 & 54.

[49] *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976).

[50] *Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999) ("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment") (citation omitted). Nevertheless, "a pretrial detainee enjoys *at least* the same constitutional protections as convicted criminal. Conduct that violates the clearly established rights of convicts necessarily violates the clearly established rights of pretrial detainees." *Blackmon v. Sutton*, 734 F.3d 1237, 1240–41 (10th Cir. 2013) (citation omitted, emphasis in *Blackmon*); *and see*, *Lopez*, 172 F.3d at 759 n. 2. (applying an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983).

[51] *Cox. v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015).

[52] *Id*., 800 F.3d at 1240 n. 3.

to be cognizable under the Cruel and Unusual Punishment Clause."[53] Delay in rendering medical care that results in death "is, without doubt, sufficiently serious to meet the objective component."[54] Sheriff does not challenge the objective component.

The subjective component of the deliberate-indifference test, which is the main focus here, requires Sheriff to have been "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and … also draw that inference."[55] Cooper's claims against Sheriff relate to municipal liability for an individual's alleged acts in his official capacity under *Monell*.[56] This does not equate to "liability under a theory of *respondeat superior*."[57] This requires Cooper to demonstrate "an affirmative link between the supervisor and the violation. Over time, this 'affirmative link' requirement came to have three related prongs: (1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind."[58]

---

[53] *Id*. (citing *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

[54] *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)) (alteration omitted); *see also*, *Estate of Booker v. Gomez*, 745 F.3d 405, 431 (10th Cir. 2014) (recognizing that death stemming from a three-minute delay is sufficiently serious).

[55] *Cox*, 800 F.3d at 1248 (citing *Farmer*, 511 U.S. at 837).

[56] *See*, *Estate of Hammers v. Douglas Cty., Kan. Bd. of Comm'rs*, 303 F. Supp. 3d 1134, 1145 (D. Kan. 2018).

[57] *Cox*, 800 F.3d at 1248.

[58] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citing *Dodds*, 614 F.3d at 1195) (brackets omitted, alteration in *Schneider*).

### 1. Sheriff was not personally involved with the assessment of Dudley's emergent medical need.

Cooper alleges that Officer Simpson pulled Dudley from the couch and slammed him onto the floor.[59] He contends that Officer Simpson knocked Dudley unconscious and caused him to suffer an acute subdural hematoma with cerebral edema, herniation, and infarction along with contusions, abrasions, fractures, and lacerations to his face, lips, and ribs.[60] He even asserts that Dudley was left lying on the ground for about thirty (30) minutes and that nearly two (2) hours passed before an ambulance was summoned.[61] Assuming for purposes of argument this is true (although it is not), these allegations say nothing about Sheriff or his knowledge of Dudley's medical needs.

Cooper contends that Sheriff, among others, was deliberately indifferent to Dudley's medical needs by failing to call for an ambulance *sooner*.[62] This is insufficient. The Walters PD called for an ambulance, which transported Dudley to the hospital.[63] More importantly, Officer Lehew summoned the ambulance within minutes of Officer Simpson

---

[59] *See*, Pl.'s Compl. (Doc. #001) at 4, ¶16.

[60] *See id.* at 4, ¶18.

[61] *See id.* at 5, ¶¶22-24, 26.

[62] *See*, *id.* at 11, ¶54; *and see*, *Schneider*, 717 P.3d at 770 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983") (quoting *Monell*, 436 U.S. at 694); *Estate of Hammers*, 303 F. Supp. 3d at 1146 ("In official capacity suits under § 1983—which are claims against the governmental entity itself—the court must determine, as a matter of law, which defendants are 'final policymakers,' looking to state law for guidance") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988)); *and see*, *also*, 19 O.S. § 131(A) (county sheriffs are elected county officials).

[63] *See*, Pl.'s Compl. (Doc. #001) at 5, ¶¶26-27.

realizing that Dudley had an urgent medical need.  Cooper cannot show there was any significant delay in providing Dudley with medical assistance, certainly, not one that lasted hours as he alleged.

While Cooper criticizes Officers Simpson and Lehew for not checking Dudley's vitals, not performing cardiopulmonary resuscitation, or not initiating some other unidentified life-saving techniques, Cooper has not shown that such actions would have somehow prevented or mitigated Dudley's acute subdural hematoma with cerebral edema, herniation, and infarction.  Cooper's insistence that the Officers failed to do anything ignores that they had already done something (summoned an ambulance) and that doing anything more could have complicated or jeopardized Dudley's condition.

Regardless, Cooper's delayed medical care claim misses the target when aimed at Sheriff.  He was not present within the residence when Dudley's emergent medical need became apparent.  Likewise, Sheriff was not involved in calling for an ambulance.  Rather, he was searching the outbuilding behind the residence for stolen property.  Neither Officer Simpson nor Officer Lehew informed Sheriff of Dudley's condition. Cooper cannot establish Sheriff's personal involvement in assessing Dudley's emergent medical need or the decision to call for an ambulance.

### 2. *Sheriff's actions or inactions did not delay Dudley's access to medical care.*

Cooper alleges that Walters PD failed to adequately train Officer Simpson and the other officers on providing detainees with access to medical care.[64]  "To establish the

---

[64] *See*, Pl.'s Compl. (Doc. #001) at 10, ¶¶47-50.

causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'"[65] "This requirement is satisfied if the plaintiff shows that the municipality was the 'moving force' behind the injury alleged."[66] Cooper must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[67] "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."[68]

Cooper's allegations fail to establish that Sheriff implemented policies or training procedures that failed to ensure medical care for detainees. Cooper's assertion that the Officers were insufficiently trained does not show that Sheriff was responsible for their training. Similarly, this fails to show that Sheriff implemented any policy that was deliberately indifferent to Dudley's medical needs.

Again, Cooper asserts that Officers Simpson and Lehew waited until 1:40 am, nearly two (2) hours, before summoning an ambulance for Dudley.[69] Cooper's underlying theme basically invokes a series of inferences that *if* Sheriff (or the Walters PD officers) had only recognized Dudley had suffered a subdural hematoma ***sooner***, then they should

---

[65] *Schneider*, 717 F.3d at 770 (citation omitted).

[66] *Id*. (citation omitted).

[67] *Id.* (citation omitted).

[68] *Id*. (citation omitted).

[69] *See*, Pl.'s Compl. (Doc. #001) at 5, ¶26.

have called for an ambulance, at least a few minutes, ***earlier***.  However, this does not establish that there was, in fact, a deliberate and conscious delay in providing Dudley with medical care.  Cooper must demonstrate that Sheriff was aware of Dudley's risk of serious harm and that he intentionally delayed medical care despite that risk.

Officer Simpson recognized that Dudley risked serious injury when he stopped moving.[70]  Officer Simpson promptly asked Officer Lehew to summon an ambulance. Officer Lewhew called dispatch and requested an ambulance at 12:35 am. It took less than fifteen (15) minutes for EMS to arrive. Cooper alleges that the delay lasted for hours.[71] Since the search commenced sometime ***after midnight***, the longest period that the delayed could have lasted was, at most, thirty-five (35) minutes.

Cooper's timeline is misstated.  The delay, if any, was nothing close to over an hour. Contrary to Cooper's assertions, Officers Simpson and Lewhew requested medical assistance, which fails to demonstrate any deliberant indifference to Dudley's emergent medical needs. Sheriff was not involved in addressing Dudley's medical needs.  Sheriff did not do anything to deliberately delay Dudley's receipt of medical care.

---

[70] Complicating the analysis is the unaccounted time between Dudley's actions while he was moving about on the floor and complaining about his handcuffs being too tight (*i.e.*, while he was responsive) and Officer Simpson's realization that Dudley had become unresponsive (*i.e.*, he was no longer moving).  Nevertheless, these interactions took place during the thirty-five (35) minute period between the initial entry into the home after midnight and Officer Lehew's call for an ambulance at 12:35 am.

[71] *See*, Pl.'s Compl. (Doc. #001) at 5, ¶26 (contending ambulance was not called until 1:40 am).

### 3. *Sheriff did not implement a policy that was deliberately indifferent of Dudley's medical needs.*

Again, Cooper fails to show that Sheriff implemented any official policy or custom that deliberately deprived Dudley of medical care. Rather, Cooper relies solely on this one instance involving Dudley as evidence of a custom of delaying medical care. "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[72]

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[73] "In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction."[74]

Cooper fails to identify a specific deficiency in Sheriff's training program that was so obvious and closely related to Dudley's injury that it might fairly be said that the official policy or practice was both deliberately indifferent to his constitutional rights and the

---

[72] *Schneider*, 717 F.3d at 770 (citations omitted).

[73] *Id*. at 771 (citations omitted, internal quotations omitted in *Schneider*).

[74] *Id*. (citations omitted, internal quotations omitted in *Schneider*).

moving force behind his death. Even if Cooper could show there was some deficiency in training (which he has not shown), it remains questionable whether that lack of training caused Sheriff to be deliberately indifferent of Dudley's injury.[75]

Cooper does not present any evidence showing that Sheriff knew of any deficiency in training or protocols that was substantially certain to result in a violation of Dudley's constitutional rights. Nor do the facts suggest that an utter lack of training was so substantial or pervasive that knowledge of a constitutional harm was highly predictable or patently obvious. There is no pattern of similar constitutional violations. Rather, Dudley's injury is the only incident that Coopers identifies. The only other thing that Cooper points toward is Dudley's intoxication, which, standing alone, did not constitute a medical need that would make Sheriff aware of Dudley's risk of death from a subdural hematoma.[76]

---

[75] *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights"); *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997); *and see*, *Rigg v. City of Lakewood*, 37 F. Supp. 3d 1207, 1214 (D. Colo. 2014) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983 … Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983 … Perhaps a wholesale failure to provide any medical training to police officers would meet this standard.") (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)) (internal citations omitted in *Rigg*).

[76] *See*, *Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (holding that although jail staff knew that detainee was intoxicated or under the influence of drugs, intoxication with its accompanying incoherence does not, by itself, give jail staff knowledge that detainee posed a specific risk of suicide).

Even in light of Dudley's intoxication, Sheriff knew what the Walters PD officers, obviously, knew: in the event of an emergency, call for an ambulance. This renders Cooper's claims against Sheriff deficient.

## V.
## CONCLUSION

Cooper fails to show that the warrant and its execution violated the Fourth Amendment. The search warrant and Sheriff's affidavit supporting it complied with the enumerated exceptions for nighttime searches under Oklahoma law. Cooper's delayed medical care claim also fails. Cooper may, at most, be able to show with 20/20 hindsight that a different course of action around midnight on March 11, 2018 could have, potentially, provided Dudley with medical care minutes sooner. Cooper falls far short of establishing that Sheriff was deliberately indifferent. Sheriff was ***not*** personally involved in any decision regarding Dudley. Sheriff did not know of or ignore any deprivation of Dudley's rights. Sheriff did not implement any policy that deprived Dudley of his rights. Cooper focuses exclusively on the events at issue. One specific instance is not enough to establish either deliberate indifference or a custom on the part of Sheriff. Sheriff is entitled to summary judgment against Cooper's claims.

**WHEREFORE**, Defendant Sheriff of Cotton County, Oklahoma, requests this Court grant it summary judgment against Plaintiff Eric Cooper's remaining claims.

GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.

/s/*Seth D. Coldiron*
James L. Gibbs, II (OBA # 15689)
David D. Proctor (OBA #13863)
Seth D. Coldiron (OBA #20041)
701 N. Broadway, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 524-2400
Facsimile: (405) 525-6004

Email: jgibbs@gphglaw.com
       dproctor@gphglaw.com
       scoldiron@gphglaw.com

*Attorneys for Defendant,*
*Sheriff of Cotton County, Okla.*

# CERTIFICATE OF SERVICE

This is to certify that on this 30th day of November 2020, a true and correct copy of the above and foregoing document was served via ECF/CM on the following counsel of record:

Stanley M. Ward
Woodrow K. Glass
Barrett T. Bowers
Tanner B. France
**WARD & GLASS, LLP**
1601 N.W. 36th Avenue, Suite 100
Norman, OK 73072
rstermer@wardglasslaw.com
woody@wardglasslaw.com
barrett@wardglasslaw.com
tanner@wardglasslaw.com

*-and-*

Bret Burns
**BURNS LAW OFFICE**
519 W. Chickasha Ave.
Chickasha, OK 73018
Bret.burns@ymail.com

*-and-*

Renee Walker Gunkel
Preston M. Gunkel
**GUNKEL LAW GROUP, PLLC**
P.O. Box 1124
Altus, OK 73522
renee@gunkellawgroup.com
preston@gunkellawgroup.com

*Attorneys for Plaintiff,*
*Eric Cooper, personal representative*
*of the Estate of Dudley Cooper*

Robert S. Lafferrandre
Carson C. Smith
**PIERCE COUCH HENDRICKSON**
  **BAYSINGER & GREEN, L.L.P.**
1109 N. Francis
Oklahoma City, Oklahoma 73106
(405) 235-1611; (405) 235-2904 (F)
rlafferrandre@piercecouch.com
csmith@piercecouch.com

*Attorneys for Defendant*
*Kent Simpson, individually*

Scott B. Wood
**WOOD, PUHL & WOOD, PLLC**
2409 E. Skelly Drive, Suite 200
Tulsa, OK 74103
okcoplaw@aol.com

*Attorney for Defendant,*
*Kesto Simpson*

Stephen L. Geries
Taylor M. Riley
**COLLINS ZORN & WAGNER, P.C.**
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
slg@czwlaw.com
tmr@czwlaw.com

*Attorneys for Defendant,*
*City of Walters*

*/s/Seth D. Coldiron*
Seth D. Coldiron