# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

ERIC COOPER, as the Personal
Representative of the Estate of Michael
Dudley Cooper, Deceased )
 )
 )
 )
   Plaintiff, )
 )
vs. ) Case No. CIV-18-1060-BJ
 )
(1) KESTO SIMPSON, individually; )
(2) THE CITY OF WALTERS, a Municipal )
Corporation; )
(3) KENT SIMPSON, individually and in his )
Official capacity; and )
(4) JOHN DOES 1-10, individually, )
 )
   Defendants. )

## DEFENDANT KESTO SIMPSON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

/s/ Scott B. Wood
Scott B. Wood
Wood, Puhl and Wood PLLC
2409 E. Skelly Drive, Suite 200
Tulsa, OK 74105
Telephone: 918-742-0808
Facsimile: 918-742-0812
Email: okcoplaw@aol.com
ATTORNEYS FOR DEFENDANT
KESTO SIMPSON

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………………………i,ii,iii

STATEMENT OF THE CASE…………………………...............………..……….…..1,2,3

STATEMENT OF UNCONTROVERTED FACTS………………………………3,4,5,6,7,8,9,10

ARGUMENTS AND AUTHORITIES……………………………….………..…….…..……10

I.     THE STANDARD FOR SUMMARY JUDGMENT…………..…….…..……….....10,11

II.    DEFENDANT SIMPSON IS ENTITLED TO QUALIFIED IMMUNITY
AS TO PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT
CLAIMS……………………………...……………………………………………..11,12

    A.  Defendant Simpson's Use Of Force Was Reasonable Under The
Circumstances and Therefore Constitutionally Permitted
Under The Fourth Amendment.……………………………………12,13,14,15,16

    B.  Defendant Simpson Did Not Act With Deliberate Indifference
To Dudley Cooper's Medical Needs In Violation of
the Fourteenth Amendment……………………………………...……...16,17,18

          i.     There Is No Evidence Defendant Simpson Delayed
Medical Care……………………………………………………………18,19

          ii.    Defendant Simpson Did Not Act With Deliberate
Indifference……………………………………………………………..19, 20

    C.  Defendant Simpson Did Not Violate Any Clearly Established Law And
Is Entitled to Qualified Immunity With Regard To Plaintiff's Fourth and
Fourteenth Amendment claims…………………………………………..…20,21

    CERTIFICATE OF SERVICE……………………………………………….………22

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*,
477 US 244, 247-48 (1986)……………………………………………………………………10

*Barrie v. Grand County, Utah.*
119 F.3d 862 (10th Cir. 1997)……………………………………………………………17 19

*Callahan v. Poppell*,
471 F.3d 1155, 1159 (10th Cir. 2006)………………..…………………………………………17

*Celotex v. Catrett*,
477 US 317, 325 (1986)………………………………………………………………………..10

*Cone v Longmont United Hosp. Ass'n.*,
14 F.3d 526 (10thCir. 1994)…………………………………………………………………...10

*Conaway v Smith*,
853 F.2d 789, 794 (10thCir. 1988)……………………………………………………………11

*Cortez v. McCauley*,
478 F.3d 1108, 1126 910th Cir. 2007)……………………………………………………………13

*Dixon v. Richer*,
922 F.2d 1456 (10th Cir. 1991)…………………………………………..……………………13

*Estate of Hocker v. Walsh*,
22 F.3d 995, 998 (10th Cir. 1994)……………………………………………………………16

*Estelle v. Gamble*,
429 U.S. 97, 97 S.Ct. 285 (1976)………………………………………………………………16

*Frohmader v. Wayne*,
766 F.Supp. 990. (D.Colo. 1991)………………………………………………………………17

*Harlow v. Fitzgerald*,
457 U.S. 800, 818 (1982)……………………………………………………………………11

*Gallegos v. City of Colorado Springs*,
114 F.3d 1024, 1030 (10th Cir. 1997)……………………………………………………………13

*Garcia v. Salt Lake County*,
7682d 303, 307 (10th Cir. 1985)………………………………………………………………16

*Gaston v. Ploeger,*
WL 5672294 (2008)…………………………………………………………………16

*Gross v. Pirtle,*
245 F.3d 1151, 1155 (10th Cir. 2001)……………………………………………..11

*Graham. v. Conner,*
490 U.S. 386, 396 (1989)……………………………………………………11,13,14

*Groh v. Ramirez,*
540 U.S. 551, 567, 124 S.Ct. 1284 (2004)………………………………………12

*Mata v. Saiz,*
427 F.3d 745, 753 (10th Cir. 2005)……………………………………...16 ,17,19

*Matsushita Electric Industries Co. v. Zenith Radio Corporation,*
475 US 574, 586-87 (1986)………………………………………………………10

*Medina v. City and County of Denver,*
960 F.2d 1493, 1498 (10th Cir. 1992)……………………………………………12

*Medina v. Cram,*
252 F.3d 1124 (10th Cir. 2001)……………………………………………………13

*Mullinex v. Luna,*
136 S.Ct. 305 (2015)……………………………………………………………...20

*Patrick v. Miller,*
953 F.2d 1240 (10th Cir. 1982)…………………………………………………..20

*Saucier v. Katz,*
33 U.S. 194, 200 (2001)……………………………………………………………11

*Tagstrom, v. Enockson,*
857 F.2d 504(8th Cir. 1998)………………………………………………………19

*Tennessee v. Garner,*
471, U.S. 1 (1985)………………………………………………………………..20

*Thomas v. International Business Machines,*
48 F.3d 478, 484 (10th Cir. 1995)………………………………………………..10

*Wilson v. Meeks,*
98 F.3d 1247, 1255 (10th Cir. 1996)……………………………………………18

**OTHER**

Federal Rules of Civil Procedure 56(c)……………………….……………………………10

COMES NOW the Defendant, Kesto Simpson, (hereinafter "Defendant" or "Defendant Simpson"), by and through his attorney of record, Scott B. Wood, of the law firm of Wood, Puhl & Wood, P.L.L.C., located in Tulsa, Oklahoma, and respectfully submits his Motion For Summary Judgment and Brief In Support. In support of his motion, Defendant Simpson states as follows:

## STATEMENT OF THE CASE

On the evening of March 11, 2018, Kesto Simpson, a CLEET certified police officer for the Town of Walters was off duty and returning from a fund raising event in Oklahoma City when he received a call to assist the Sheriff, Kent Simpson (Officer Kesto's father), in the service of a search warrant arising from an investigation conducted by Sheriff Kent Simpson. Kesto Simpson was advised the search warrant had arisen out of an investigation of a burglary in which guns were stolen. Defendant Kesto Simpson then called the Walters Chief of Police, Tommy Stranahan, to inform him of the Sheriff's request for assistance in the service of a search warrant and get his approval which was given. Kesto Simpson arrived home, changed into his uniform, and then proceeded to the Sheriff's office arriving sometime after 11:30 p.m. Two other Walters Police Department officers, Ben Lehew and Teague Liming were also present. Upon arrival Kesto learned the search warrant was for a house which was at an address which the Walters Police Chief had advised his officers to never go to without a backer, due to previous incidents of violence. That address was 515 W. Nebraska in Walters, Oklahoma.

Kesto Simpson did not review the warrant or the affidavit for the search warrant before he and officers Lehew and Liming headed to the location which was only a few blocks away. Upon arrival, the Walter's officers took their assigned locations outside the residence and Sheriff Simpson and Kesto Simpson headed to the front door and knocked and an announcement was

made that it was the "Sheriff's Department!" along with "Search warrant!" Once the door was opened, three individuals were in the living room: Ricky Crank, Sadie Teakell and Plaintiff's decedent, Dudley Cooper. Ricky Crank was standing just inside the living room after having opened the door. Dudley Cooper was sitting on a couch just inside the living room to the right of the door, at the end closest to the front door. Dudley Cooper's sister, Sadie Teakell, was at the opposite end of the same couch. All three were ordered to get on the floor, which is standard procedure when serving a search warrant involving weapons, and the goal is to get everyone secured in handcuffs as quickly as possible. Ms. Teakell and Mr. Crank complied after several commands, but Mr. Cooper did not. Kesto Simpson reached for Dudley Cooper's left arm, but he pulled back away from Kesto Simpson. Kesto Simpson then reached again and grasped Mr. Cooper by the left wrist and placed his other hand on the back of his left upper arm which is a technique he learned for custody and control when he was in the CLEET training academy. The maneuver is often referred to as an "arm bar." Kesto Simpson then pulled Mr. Cooper forward onto the floor in front on where he was sitting. Mr. Cooper did not react to catch himself, probably due to his extreme level of alcohol intoxication, and he struck his face on the floor. Kesto Simpson then promptly applied handcuffs to Mr. Cooper. Mr. Crank and Ms. Teakell were also handcuffed.

Sheriff Simpson and Officer Liming made a quick trip through the rest of the house to ensure no one else was in the residence for officer safety before the search for the guns began. Once the house was cleared, Mr. Crank was placed in a chair and Mr. Cooper and Ms. Teakell were put back onto the couch where they were initially. When he was placed on the couch Mr. Cooper was conscious. Then the search for the guns was started. A few minutes after being on the couch, Mr. Cooper complained that his handcuffs were too tight. Kesto Simpson, who was not involved in the search but was only watching the handcuffed subjects in the living room, leaned

Mr. Cooper forward and checked the tightness and was able to get his index finger in the space between the cuff and his wrist, which is how he was trained to check the appropriate tightness of handcuffs. Mr. Cooper then leaned back and within a few minutes appeared to pass out. Kesto Simpson became concerned about him and tried to awaken him by shaking him. Ms. Teakell told Kesto Simpson to leave him alone because he was drunk. Kesto Simpson then decided medical attention was needed and had another officer make a request for an ambulance. A short time later an ambulance arrived, and Mr. Cooper was transported to Comanche County Memorial Hospital in Lawton, Oklahoma.

After arrival at the hospital, Mr. Cooper was diagnosed with a brain bleed and had surgery but died later in the day on March 12. According to the surgeon who operated on him, Mr. Cooper's blood clots, or parts of it, could have been present for up to two weeks prior.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. At the time of the incident in March of 2018, Kesto Simpson was a CLEET (Council on Law Enforcement Education and Training) certified police officer for the City of Walters Police Department. He attended the CLEET Academy for reserve officers in 2008 and obtained his certification on May 7, 2008. (Affidavit of Kesto Simpson, Exh. 1, and Exh. 2, CLEET training records summary for Kesto Simpson).

2. From 2008 to 2017, Kesto Simpson worked as a reserve deputy for the Stephens County Sheriff's Department, the Jefferson County Sheriff's Department, the Waurika, Oklahoma Police Department, and the Walter's Police Department. (Affidavit of Kesto Simpson, Exh. 1, and Exh. 2, CLEET training records summary for Kesto Simpson).

3. From 2013 through 2017, Kesto Simpson worked as a reserve officer for the Town of Walters, Oklahoma. (Affidavit of Kesto Simpson, Exh. 1, and Exh. 2, CLEET training records summary for Kesto Simpson).

4. In February of 2018, Kesto Simpson was hired as a full-time officer for the Town of Walters, Oklahoma. (Affidavit of Kesto Simpson, Exh. 1, and Exh. 2, CLEET training records summary for Kesto Simpson).

5. On the evening of March 11, 2018, Kesto Simpson was off duty when he was contacted by phone by his father, Cotton County Sheriff Kent Simpson. Kent Simpson requested assistance in the service of a search warrant for guns that were taken in a burglary. The search warrant was for a residence located in the Town of Walters. (Affidavit of Kesto Simpson, Exh. 1).

6. Kesto Simpson then contacted the Walters Police Chief, Tommy Stranahan, to obtain permission for he and other Walters officers to assist Sheriff Kent Simpson in the service of the warrant. (Affidavit of Kesto Simpson, Exh. 1).

7. Kesto Simpson then spoke to the Walters officer on duty at the time, Ben Lehew, and advised him of the search warrant. (Affidavit of Kesto Simpson, Exh. 1).

8. Kesto Simpson also contacted off-duty Walters officer Teague Liming, and asked him to assist in the service of the search warrant. (Affidavit of Kesto Simpson, Exh. 1).

9. Kesto Simpson received a second phone call from Sheriff Kent Simpson and was advised he was going to get the search warrant signed. (Affidavit of Kesto Simpson, Exh. 1).

10. Sheriff Kent Simpson, and officers Kesto Simpson, Ben Lehew and Teague Liming all met in the parking lot of the Cotton County Sheriff's Department. (Affidavit of Kesto Simpson, Exh. 1).

11. While in the parking lot there was a brief conversation about where they were going, that there were weapons involved, that there were probably four persons in the house and where each officer was going to go when they arrived. (Affidavit of Kesto Simpson, Exh. 1).

12. Officer Ben Lehew drew a diagram of the layout of the house and where an out-building was located. (Affidavit of Kesto Simpson, Exh. 1).

13. Kesto Simpson believed the service of the search warrant was a high-risk operation because guns were involved. (Affidavit of Kesto Simpson, Exh. 1).

14. The address they were going to was 515 W. Nebraska. (Affidavit of Kesto Simpson, Exh. 1).

15. Prior to going to serve the warrant Kesto Simpson did not review the search warrant affidavit or the search warrant itself. (Affidavit of Kesto Simpson, Exh. 1).

16. Prior to going to serve the warrant it was believed Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell would be at the house at 515 W. Nebraska. (Affidavit of Kesto Simpson, Exh. 1).

17. Prior to going to serve the warrant no one told Officer Kesto Simpson where the stolen guns were supposed to be located. (Affidavit of Kesto Simpson, Exh. 1).

18. Officer Kesto Simpson knew who Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell were prior to March 11, 2018. (Affidavit of Kesto Simpson, Exh. 1).

19. Prior to March 11, 2018, Officer Kesto Simpson had never arrested Dudley Cooper or had official on duty contact with him while on duty as a law enforcement officer. (Affidavit of Kesto Simpson, Exh. 1).

20. The officers arrived at 515 W. Nebraska just after midnight. (Exh. 1, Affidavit of Kesto Simpson, and Exh. 3, Walters Police Department Activity Log).

21. Upon arrival Sheriff Simpson and Officer Kesto Simpson went to the door of an out-building and announced, "Police Department." No one was in the out-building so Sheriff Simpson and Officer Kesto Simpson proceeded to the front door of the residence. (Affidavit of Kesto Simpson, Exh. 1).

22. Prior to Sheriff Simpson and Officer Kesto Simpson reaching the front door, Sadie Teakell noticed "cop cars" down the street and announced that to Mr. Crank and Mr. Cooper. (Ex. 4, Deposition of Sadie Teakell, p. 55, l. 20 to p. 57, l. 16).

23. Ricky Crank got up and went to the door at about the same time Sheriff Simpson and Officer Kesto Simpson arrived at the front door. (Ex. 4, Deposition of Sadie Teakell, p. 57, l. 17-20).

24. When the door opened Kesto Simpson announced it was the "Police Department." (Affidavit of Kesto Simpson, Exh. 1).

25. Ricky Cranked backed up from the door and Kesto Simpson said "Search warrant. Get on the ground." Kesto Simpson said this two or three times before Mr. Crank complied. (Affidavit of Kesto Simpson, Exh. 1).

26. Sheriff Kent Simpson also issued command for the subjects in the room to get on the ground. (Affidavit of Kesto Simpson, Exh. 1).

27. As Sheriff Simpson and Kesto Simpson entered, Sheriff Simpson was on the left and Kesto Simpson was on the right, and Officer Teague Liming was behind them. (Affidavit of Kesto Simpson, Exh. 1).

28. Directly to the right of the front door there was a couch up against the wall with two people sitting on each end. Nearest the front door is where Dudley Cooper was seated and at the other end Sadie Teakell was seated. (Affidavit of Kesto Simpson, Exh. 1).

29. Sadie Teakell went to the floor in front of the couch about the same time as Ricky Crank went to the floor. (Affidavit of Kesto Simpson, Exh. 1).

30. Dudley Cooper did not go to the floor and another order to get on the floor was announced but Mr. Cooper still did not move. Kesto Simpson could see the left side on Mr. Cooper's face, but could not see Dudley Cooper's right side, including his right hand. (Affidavit of Kesto Simpson, Exh. 1).

31. At that time Kesto Simpson reached down to grab his left arm which was resting on the arm of the couch to place him in an arm bar so he could place him on the floor to be handcuffed for officer safety. (Affidavit of Kesto Simpson, Exh. 1).

32. Mr. Cooper pulled away from Officer Kesto Simpson to the right. (Affidavit of Kesto Simpson, Exh. 1).

33. Officer Kesto Simpson then reached again and, with his left hand, got a firm grip on Mr. Cooper's left wrist and put his right hand on the back of the upper part of Mr. Cooper's left arm above the elbow, placing Mr. Cooper in an arm bar. (Affidavit of Kesto Simpson, Exh. 1).

34. Officer Kesto Simpson then moved Mr. Cooper forward to place him on the floor. (Affidavit of Kesto Simpson, Exh. 1).

35. The arm bar technique was a maneuver Kesto Simpson was taught while he was in the Reserve CLEET academy in the control and custody block in 2008. Kesto Simpson performed the maneuver in accordance with the training he received at CLEET. (Affidavit of Kesto Simpson, Exh. 1).

36. Officer Kesto Simpson believed, based on Mr. Cooper's initial reaction of pulling away from him, that he would be met with resistance in getting Mr. Cooper off the couch to the floor. (Affidavit of Kesto Simpson, Exh. 1).

37. Ms. Teakell heard Mr. Cooper hit the floor, which caused her to then look over at him. (Ex. 4, Deposition of Sadie Teakell, p. 63, l. 25 to p. 64, l. 9).

38. Officer Kesto Simpson then pulled Mr. Cooper forward towards the floor in front of the couch. In doing this Officer Kesto Simpson placed his right knee on the floor next to where Mr. Cooper was coming towards the floor. (Affidavit of Kesto Simpson, Exh. 1).

39. Mr. Cooper came forward and went to the floor with no resistance, did not break his fall, and landed face down on the floor. (Affidavit of Kesto Simpson, Exh. 1).

40. Once Mr. Cooper was on the floor Officer Kesto Simpson placed his left knee on the floor. (Affidavit of Kesto Simpson, Exh. 1).

41. Officer Kesto Simpson then placed handcuffs on Mr. Cooper. (Affidavit of Kesto Simpson, Exh. 1).

42. Sheriff Kent Simpson placed Ricky Crank in handcuffs after he went to the ground. (Affidavit of Kesto Simpson, Exh. 1).

43. Officer Teague Liming stepped over to where Sadie Teakell was on the floor in front of the couch and placed her in handcuffs. (Affidavit of Kesto Simpson, Exh. 1).

44. Once Mr. Crank, Mr. Cooper and Ms. Teakell were handcuffed, Sheriff Kent Simpson and Officer Liming cleared the rest of the house to make sure there was no one else present. Officer Kesto Simpson stayed in the front room to watch the handcuffed subjects. (Affidavit of Kesto Simpson, Exh. 1).

45. After the rest of the house was cleared, Officer Kesto Simpson placed Mr. Cooper back onto the couch where he was originally. (Affidavit of Kesto Simpson, Exh. 1).

46. Mr. Crank was also placed in a chair and Ms. Teakell also went back on the couch where she had been originally. (Affidavit of Kesto Simpson, Exh. 1).

47. Sheriff Simpson and Officer Liming then began searching the residence. (Affidavit of Kesto Simpson, Exh. 1).

48. After being placed on the couch Mr. Cooper complained to Officer Kesto Simpson that his handcuffs were too tight. (Affidavit of Kesto Simpson, Exh. 1).

49. In response to Mr. Cooper's complaint, Officer Kesto Simpson had him lean forward so he could reach down and check the tightness of the handcuffs. Officer Kesto Simpson could place his finger in between the handcuff and Mr. Cooper's wrist, indicating the handcuffs were not too tight. (Affidavit of Kesto Simpson, Exh. 1).

50. After some time passed, Officer Kesto Simpson noticed that Mr. Cooper was unresponsive. (Affidavit of Kesto Simpson, Exh. 1).

51. Mr. Cooper was also bleeding from the mouth. (Dkt. 1, Plaintiff's Complaint)

52. Officer Kesto Simpson's radio battery was dead, so he then stepped outside and told Officer Lehew that an ambulance was needed because Mr. Cooper was unresponsive. (Affidavit of Kesto Simpson, Exh. 1).

53. According to records prepared at or near the time of the incident, the police dispatcher was notified at 0035 (12:35 a.m.) that Officer 2003 was requesting Memorial 141 to come check on a subject at 515 W. Nebraska, and that a drunk male subject was placed on the ground pretty hard and needed to be checked out just in case. The Walters radio log also indicates at 0046 Memorial 141 was enroute. (Exh. 3, Walters Police Department Radio Log).

54.  An ambulance arrived at 515 W. Nebraska shortly thereafter, at approximately 0048 hours on March 12, 2020.  (Ambulance run report, Exh. 5)

55. Mr. Cooper was transported to Lawton, Oklahoma to the Comanche County Memorial Hospital.  He was diagnosed with a subdural hematoma and had surgery.  He passed away on March 12, 2018.

56. Plaintiff has no evidence that Defendant Kesto Simpson intentionally injured Mr. Cooper or intentionally caused Mr. Cooper's head to strike the floor.  (Affidavit of Kesto Simpson, Exh. 1).

## ARUGMENTS AND AUTHORITIES

### I.    THE STANDARD FOR SUMMARY JUDGMENT.

Federal Rules of Civil Procedure 56(c) provides summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 US 244, 247-48 (1986).  The moving party has the burden of demonstrating the absence of a genuine issue of fact. *Celotex v. Catrett*, 477 US 317, 325 (1986).  If this initial burden is satisfied, the non-moving party then has the burden of coming forward with specific facts showing there is a genuine issue for trial as to elements essential to the non-moving party's case.  *Matsushita Electric Industries Co. v. Zenith Radio Corporation*, 475 US 574, 586-87 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment in favor of the moving party is proper."  *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir. 1995).  Furthermore, as described by the court in *Cone v Longmont United Hosp. Ass'n.,* 14 F.3d 526 (10thCir. 1994), "Even though all doubts must be resolved in (the nonmovant's favor)

allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 US at 324). Moreover, "in response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v Smith,* 853 F.2d 789, 794 (10thCir. 1988).

## II.     DEFENDANT SIMPSON IS ENTITLED TO QUALIFIED IMMUNITY AS TO  PLAINTIFF'S FOURTH AND FOURTEENTH AMENDMENT CLAIMS.

Plaintiff's Fourth and Fourteenth Amendment claims are subject to the qualified immunity doctrine, which shields governmental officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In civil rights actions seeking damages from governmental officials, "courts recognize the affirmative defense of qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001). Moreover, the Supreme Court has held that "[w]here the Defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Accordingly, qualified immunity is effectively lost if a case is erroneously permitted to go to trial. *Saucier*, 533 U.S. 194, 200 (2001).

Furthermore, a request for qualified immunity is separate and distinct from the defense to an excessive force claim. The Supreme Court of the United States held that "immunity and excessive force inquiries remain distinct after *Graham*." *Id.* The Court went on to state that a deputy who "reasonably but mistakenly, believed that a suspect was likely to fight back, would be justified in using more force than was in fact needed." *Id*. Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances she confronted. *Id.* (qualified immunity operates "to protect officers from the sometimes 'hazy' border between excessive and acceptable force").

Because the focus is on whether the officer had fair notice that his or her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004). As such, even if Defendant Simpson's perception of the need for deadly force was mistaken, he is entitled to qualified immunity.

Traditionally, the threshold inquiry in considering qualified immunity is whether the officer violated a constitutional right. *Saucier*, 533 U.S. 194, 200 (2001). If no constitutional rights are determined violated, then there is no need for further inquiries. *Id.* If a violation is identified, then it must be determined that the constitutional right was clearly established. *Id.* Generally, there must be a Supreme Court or Tenth Circuit decision on point, or a clearly established weight of authority from other courts for the law to be clearly established. *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). In the case at bar, Defendant Simpson is entitled to qualified immunity under both prongs of *Saucier*.

### A. Defendant Simpson's Use of Force Was Reasonable Under the Circumstances and Therefore Constitutionally Permitted Under the Fourth Amendment.

The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it. *Graham v. Conner*, 490 U.S. 386, 396 (1989). The Supreme Court held in *Graham* that excessive force claims should be analyzed

under the "objective reasonableness" standard of the Fourth Amendment. 490 U.S. 386. The use of the reasonableness standard in Section 1983 actions is "clearly established" in that it an obj4ectvie standard that his heavily fact dependent. *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991). The test for determining whether a police officer uses excessive force in violation of the fourth Amendment is whether the officer action s are objectively reasonable in light of the totality of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Graham*, 490 U.S. 386. This inquiry must be undertaken from "the perspective of a reasonable officer on the scene rather than the 20/20 vision of hindsight. *Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001). Therefore, in reviewing excessive force claims, we acknowledge that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers will violate a citizen's constitutional rights." *Graham*, 490 U.S. 386.

Thus, the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case. *Cortez v. McCauley*, 478 F.3d 1108, 1126 910th Cir. 2007). The Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests. *Cortez*, 478 F.3d 1108. Further, where there are concerns for officer safety, officers may take reasonable steps to protect their personal safety and maintain the status quo during an investigative detention. *Id*. As such, the Tenth Circuit has held that law enforcement officers may place suspects on the ground and use handcuffs during investigative detentions. *Id*. Likewise, the Tenth Circuit has held that an arm bar takedown of a suspect during an investigative detention was not unreasonable when the officer reasonably perceived a threat to officer safety. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997).

The Supreme Court in *Graham* has set out three criteria relevant to an excessive force inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* In addition, __an assessment of the degree of force actually used is critical to the balancing test used to determine if the force was excessive__. Under the *Graham v. Connor* analysis, one must first consider the severity of the crime at issue. Although there was not an initial crime at issue in this case, Defendant Simpson as well as the other officers were in the process of executing a search warrant involving stolen weapons, which was a high-risk operation. Second, upon entry into the home and the announcement of "search warrant. Get on the ground." Dudley Cooper refused to comply, and Defendant Simpson could not see Dudley Cooper's right side, including his right hand. (Affidavit of Kesto Simpson, Exh. 1). Again, due to the fact that the search warrant was for guns, and there was a possibility of a higher risk of harm for officers, Defendant Simpson's inability to see Dudley Cooper's hands posed an immediate threat to the safety of himself and the other officers.

Finally, in accordance with *Graham*, throughout the entire incident, Dudley Cooper was repeatedly ordered to get on the ground and refused to comply with officer commands. Specifically, Defendant Simpson initially attempted to place Dudley Cooper in an arm bar so he could place him on the floor to be handcuffed for officer safety. (Affidavit of Kesto Simpson, Exh. 1). Mr. Cooper pulled away from Officer Kesto Simpson to the right. (Affidavit of Kesto Simpson, Exh. 1). Officer Kesto Simpson then reached again and, with his left hand, got a firm grip on Mr. Cooper's left wrist and put his right hand on the back of the upper part of Mr. Cooper's left arm above the elbow, placing Mr. Cooper in an arm bar. (Affidavit of Kesto Simpson, Exh. 1). Officer Kesto Simpson then moved Mr. Cooper forward to place him on the floor. (Affidavit

of Kesto Simpson, Exh. 1). Officer Kesto Simpson believed, based on Mr. Cooper's initial reaction of pulling away from him, that he would be met with resistance in getting Mr. Cooper off the couch to the floor. (Affidavit of Kesto Simpson, Exh. 1). Officer Kesto Simpson then pulled Mr. Cooper forward towards the floor in front of the couch. In doing this Officer Kesto Simpson placed his right knee on the floor next to where Mr. Cooper was coming towards the floor. (Affidavit of Kesto Simpson, Exh. 1). Mr. Cooper came forward and went to the floor with no resistance, did not break his fall, and landed face down on the floor. (Affidavit of Kesto Simpson, Exh. 1).

Defendant Simpson then placed handcuffs on Mr. Cooper and placed him back on the couch. (Affidavit of Kesto Simpson, Exh. 1). At that time, Dudley Cooper was conscious, not visibly injured and talking. (See Deposition of Kesto Cooper, Exh. "2" of Co-Defendant Cotton's Motion for Summary Judgment, Dkt. No. 86). In fact, Dudley Cooper complained to Defendant Simpson that his handcuffs were too tight. (Affidavit of Kesto Simpson, Exh. 1). Defendant Simpson approached Dudley Simpson and checked the tightness of the handcuffs. (Affidavit of Kesto Simpson, Exh. 1). It was not until some time had passed Defendant Simpson noticed that Dudley Cooper was unresponsive. (Affidavit of Kesto Simpson, Exh. 1). Upon noticing Dudley Cooper unresponsive, he stepped outside and told Officer Lehew that an ambulance was needed. (Affidavit of Kesto Simpson, Exh. 1).

The only force used by Defendant Simpson was an arm bar technique in order to gain compliance over Dudley Simpson, who refused to comply with commands to place his hands behind his back and get on the ground. At no time did the actions of Defendant Simpson intentionally or knowingly caused any injury to Dudley Cooper. The amount of force used was completely reasonable within the constitutional limits of the Fourth Amendment. Considering the

"totality of the circumstances," Defendant Simpson exercised reasonable and justifiable force to protect himself and the other individuals at the scene.

**B. Defendant Simpson Did Not Act With Deliberate Indifference to Dudley Cooper's Medical Needs In Violation of the Fourteenth Amendment.**

Defendant Simpson did not act with deliberate indifference to Dudley Cooper's medical needs, thus defeating Plaintiff's Fourteenth Amendment due process claim. The constitutional protection against deliberate indifference to a prisoner's serious medical needs, as announced in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285 (1976) (Eighth Amendment shields prisoners after adjudication), applies to pretrial detainees through the due process clause of the Fourteenth Amendment. *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985). As such, under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment. *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994). Thus, Plaintiff's claim for inadequate medical attention must be judged against the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97); See also, *Gaston v. Ploeger*, WL 5672294 (2008).

In *Estelle*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment. Thus, individuals may be liable under Section 1983 only for "indifference…manifested…in their response to the prisoner's need or by …intentionally denying or delaying access to medical care on intentionally interfering with treatment once prescribed." *Estelle,* 429 U.S. 97. The Tenth Circuit established a "medical need is sufficiently serious" if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See, *Mata v. Saiz*,

427 F.3d 745, 753 (10th Cir. 2005).  Once a "serious medical need" is identified, a constitutional violation of this need *only* occurs when a government official's "deliberate indifference is exhibited toward such needs."  *Frohmader v. Wayne*, 766 F.Supp. 990. (D.Colo. 1991).

The *Estelle* test in determining the existence of "deliberate indifference to serious medical needs" is comprised of an objective and subjective component. *Id.*  **Plaintiff must meet both the objective and subjective components in order to maintain a cause of action against a defendant**.  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).  First, the objective component of the deliberate indifference standard requires the detainee produce objective evidence that the deprivation at issue was in fact sufficiently serious.    Second, under the subjective component, the detainee must establish deliberate indifference to his serious medical needs by "presenting evidence of the official's culpable state of mind."  *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).  This standard requires a higher degree of fault than negligence or even gross negligence. *Barrie v. Grand County, Utah*. 119 F.3d 862 (10th Cir. 1997).

As outlined above, under the Fourteenth Amendment Due Process Clause, a delay in medical care can be a constitutional violation when that delay results in "substantial harm" and when the government actor was "deliberately indifferent" to the risk of that harm.  *Estelle,* 429 U.S. 97.  Considered from this perspective, the question is whether, based on the evidence before the court, a reasonable jury could find that Defendant Simpson was "deliberately indifferent" to Dudley Cooper's medical needs because he did not tend to his injuries and/or failed to seek any medical care or treatment for Dudley for a period of more than one hour.  (Complaint, pg. 8, para. 39, Dkt. No. 1).  In accordance with *Estelle*, this question has both objective and subjective elements: (1) whether the need for medical care was sufficiently serious; and (2) whether Defendant Simpson acted with sufficient culpability in facility to render that care.  *Id*.  Defendant

Simpson does not dispute that Dudley Cooper's injuries met the threshold question of being "sufficiently serious." Now, the court must turn to the subjective component to determine whether Defendant Simpson knew that Dudley Cooper faced "a substantial risk of harm", and whether Defendant Simpson nevertheless disregarded that risk of harm with deliberate indifference.

### i. *There Is No Evidence Defendant Simpson Delayed Medical Care.*

In the instant case, Plaintiff's Fourteenth Amendment claim is based on Defendant Simpson's alleged failure to seek any medical care or treatment for Dudley for a period of more than one hour. (Plaintiff's Complaint, pg. 8, para. 39, Dkt. No. 1). First, there was nothing, under the law, that required Defendant Simpson to administer aid. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996). Current Tenth Circuit precedent holds Defendant Simpson did not have an established constitutional duty to render medical aid to Dudley Cooper once medical aid had been summoned. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996). In *Wilson*, after a police officer shot a man holding a gun, other officers had the shooting victim handcuffed before medical help arrived. From there, the officers did not administer medical care of first aid before emergency medical technicians arrived. *Id.* The Court held that the due process clause does not establish an affirmative duty on police officers to provide medical care-even something as basic as CPR, in any and all circumstances, or impose a duty on the officers to render first aid. *Id.*

In the case at bar, the uncontroverted evidence establishes Defendant Simpson fulfilled his constitutional duty to Dudley Cooper. It is undisputed, that after noticing Dudley Cooper became unresponsive, Defendant immediately notified another officer to have an ambulance sent to the home. Thus, having immediately called paramedics upon realizing Dudley Cooper needed medical assistance, and knowing that other officers and first responders were on the way, Defendant Simpson was under no constitutional obligation to immediately render medical

treatment instead of working to secure the scene. *Wilson*. 98 F.3d 1247; citing, *Tagstrom, v. Enockson,* 857 F.2d 504(8th Cir. 1998) (finding no delay or denial of medical treatment where officers immediately called in an accident and waited with the victim until ambulances arrived.)

Further, the Court in *Wilson*, went on to make a distinction between the provision of "medical care" that only "highly trained personnel" can provide and "first aid" that "anyone" can provide. *Id.* While it is true that "anyone can render first aid," the nature of any given injury faced by police officers in a rapidly unfolding and dynamic situation may dictate whether providing first aid is actually a good idea. *Id.* Indeed, there may be medical disagreement about how best to proceed. *Id.* As pointed out in *Wilson*, there was disagreement about whether breathing is best facilitated by lying on one's side or one's back. *Id.* As a result, the court held "to legally require police officers to provide first aid, or to take specific action, in every situation and to hold them legally responsible for civil rights violations when they fail to do so, is in the words of the Tenth Circuit "unfair and unwise." *Id.* By Defendant Simpson requesting a call for emergency medical services, Defendant Simpson fulfilled his constitutional duty to Dudley Cooper and therefore, is entitled to summary judgment with regard to Plaintiff's Fourteenth Amendment claim.

**ii.    *Defendant Simpson Did Not Act With Deliberate Indifference.***

As set forth above, to establish "deliberate indifference" to serious medical needs, Plaintiff must prove Defendant Simpson *intentionally* denied or delayed access to medical care, meaning Defendant Simpson deliberately interfered with getting Dudley Cooper medical care, knowing he would suffer additional harm. *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). Negligence or even gross negligence will not suffice. *Barrie v. Grand County, Utah*. 119 F.3d 862 (10th Cir. 1997). In the case at bar, there is no evidence that Defendant Simpson unconscionably delayed Dudley Cooper's medical treatment. The uncontroverted evidence shows that the officers on the

scene called for EMS immediately after Defendant Simpson noticed Dudley Cooper became unresponsive.

### C. Defendant Simpson Did Not Violate Any Clearly Established Law and is Entitled to Qualified Immunity With Regard to Plaintiff's Fourth and Fourteenth Amendment Claims.

As set forth above, the undisputed evidence establishes Defendant Simpson did not violate Dudley Cooper's constitutional rights for purposes of qualified immunity. However, even if the Court were to find a violation of Plaintiff's Fourth and/or Fourteenth Amendment rights, Defendant Simpson is still entitled to qualified immunity under the second prong of *Saucier*. To survive summary judgment in instances where the defense of qualified immunity is asserted, Plaintiff must do more than make general allegations that the defendant's conduct was unreasonable; rather, the plaintiff's rights must be sufficiently defined so that a "reasonable official would understand that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S at 202.

In order to overcome the defense of qualified immunity, Plaintiff must make a particularized showing that the law is sufficiently clear that Defendant Simpson would have known that his conduct against Dudley Cooper was unconstitutional. See *Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1982). The Supreme Court holds that the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202.

Most recently the Supreme Court in *Mullinex v. Luna*, 136 S.Ct. 305 (2015), has further defined the "clearly-established-law" prong of the qualified immunity analysis stating: "[t]he dispositive question in determining whether defendants violate clearly established law, is 'whether the violative nature of particular conduct is clearly established.' *Mullinex*, 136 S.Ct. 305 (2015).

More importantly, the court in *Mullinex* emphasized that "this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Finally, the court stressed that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, will apply to the factual situation the officer confronts." *Id.*

In *Mullinex,* the Supreme Court rejected the Fifth Circuit's using as clearly established law a general rule that "a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officers or others." 773 F.3d 725. This decision harked back to *Haugen v. Brosseau*, where the Court had rejected as "mistaken" the Ninth Circuit's use of an equally general test for excessive force taken from *Tennessee v. Garner*, 471, U.S. 1 (1985), namely, that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 136 S.Ct. at 309. Furthermore, existing precedent must have placed the statutory or constitutional question "beyond debate." *Id*. Here, there is no clearly established law sufficient to have put Defendant Simpson on notice that his conduct was unreasonable in the situation he confronted. *Saucier*, 533 U.S. 194, 202. Therefore, Defendant Simpson is entitled to qualified immunity.

WHEREFORE, premises considered, Defendant Kesto Simpson respectfully requests the Court grant his Motion for Summary Judgment.

Respectfully submitted,

/s/ Scott B. Wood
Scott B. Wood
Wood, Puhl and Wood PLLC
2409 E. Skelly Drive, Suite 200
Tulsa, OK 74105
Telephone: 918-742-0808
Email: okcoplaw@aol.com
*Attorney for Kesto Cooper*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 1, 2020, a true and correct copy of the above and foregoing document was delivered via electronic mail to:

Stanley M. Ward
Woodrow K. Glass
Barrett T. Bowers
Tanner B. France
Bret Burns
Carson C. Smith
Stephen L. Geries
Taylor Riley
James L. Gibbs
Seth D. Coldiron

/s/ Scott B. Wood
Scott B. Wood