# **AFFIDAVIT OF KESTO SIMPSON**

STATE OF OKLAHOMA )
                                ) ss.
COUNTY OF COTTON )

I, Kesto Simpson, being first duly sworn upon oath and being of lawful age and having personal knowledge of the facts herein asserted, state the following:

1. In March of 2018, I was a CLEET (Council on Law Enforcement Education and Training) certified police officer for the Town of Walters Police Department. I attended the CLEET Academy for reserve officers in 2008 and obtained my certification on May 7, 2008.

2. From 2008 to 2017, I worked as a reserve deputy/officer for the Stephens County Sheriff's Department, the Jefferson County Sheriff's Department, the Waurika, Oklahoma Police Department, and the Walter's Police Department.

3. From 2013 through 2017, I worked as a reserve officer for the Town of Walters, Oklahoma.

4. In February of 2018, I was hired as a full-time officer for the Town of Walters, Oklahoma.

5. On the evening of March 10, 2018, I was off duty when I was contacted by phone by my father, Cotton County Sheriff Kent Simpson. Kent Simpson requested assistance in the service of a search warrant for guns that were taken in a burglary. Sheriff Simpson said the search warrant was for a residence located in the Town of Walters.

6. I then contacted the Walters Police Chief, Tommy Stranahan, to obtain permission for me and other Walters officers to assist Sheriff Kent Simpson in the service of the warrant.

7. Backing or assisting the Cotton County Sheriff's Office when they had activity inside the Town limits of Walters was a fairly regular occurrence.

1

8. I then spoke to the Walters officer on duty at the time, Ben Lehew, and advised him of the search warrant.

9. I also contacted off-duty Walters officer Teague Liming, and asked him to assist in the service of the search warrant.

10. I received a second phone call from Sheriff Kent Simpson and was advised he was going to get the search warrant signed.

11. Sheriff Kent Simpson, me, and officers Ben Lehew and Teague Liming all met in the parking lot of the Cotton County Sheriff's Department.

12. While in the parking lot there was a brief conversation about where we would all be going, the fact that there were weapons involved, that there were probably four persons in the house, and where each officer was going to go when we arrived.

13. While in the parking lot Officer Ben Lehew drew a diagram of the layout of the house and where an out-building was located.

14. Due to the fact the search warrant was for guns, I believed the service of the search warrant would hold a higher risk of harm for officers than other forms of property or contraband.

15. I was told the address of the search warrant was 515 W. Nebraska.

16. I recognized the address of 515 W. Nebraska as an address where officers of the Walters Police Department had been told not to go without a backer by Police Chief Tommy Stranahan because of previous incidents of violence occurring at that location.

17. Prior to going to serve the warrant I did not review the search warrant affidavit or the search warrant itself.

18. Prior to going to serve the warrant I was told it was believed Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell would be at the house at 515 W. Nebraska.

19. Prior to going to serve the warrant no one told me where the stolen guns were supposed to be located.

20. I knew who Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell were prior to March 10, 2018.

21. Prior to March 10, 2018, I had never arrested Dudley Cooper or had any official on duty contact with him while on duty as a law enforcement officer.

22. As we left the parking lot at the Sheriff's Department, I pushed the button on my body worn camera to activate it.

23. I, along with the other officers, arrived at 515 W. Nebraska just after midnight.

24. Upon arrival Sheriff Simpson and I went to the door of an out-building and announced, "Police Department." No one was in the out-building so Sheriff Simpson and I proceeded to the front door of the residence.

25. When the door front door opened, I announced, "Police Department." Ricky Crank backed up from the door I said "Search warrant. Get on the ground." I said this two or three times.

26. Sheriff Kent Simpson also issued command for the subjects in the room to get on the ground.

27. As Sheriff Simpson and I entered, Sheriff Simpson was on the left and I was on the right, and Officer Teague Liming was behind them.

28. Directly to the right of the front door there was a couch up against the wall with two people sitting on each end. Nearest the front door is where Dudley Cooper was seated and at the other end Sadie Teakell was seated.

29. Sadie Teakell went to the floor in front of where she was sitting on the couch about the same time as Ricky Crank was secured in handcuffs.

30. Dudley Cooper did not go to the floor and I issued another order for him to get on the floor, but Mr. Cooper still did not move. I could see the left side on Mr. Cooper's face, but could not see Dudley Cooper's right side, including his right hand.

31. At that time I reached down to grab his left arm which was resting on the arm of the couch to place him in an arm bar so he could place him on the floor to be handcuffed for officer safety.

32. Mr. Cooper pulled away from me to his right.

33. I then reached again and, with my left hand, and got a firm grip on Mr. Cooper's left wrist and put my right hand on the back of the upper part of Mr. Cooper's left arm above the elbow, placing Mr. Cooper in an arm bar.

34. The arm bar technique was a maneuver I was taught while I was in the Reserve CLEET academy in the control and custody block of instruction in 2008. I performed the arm bar maneuver in accordance with the training I received at CLEET.

35. I believed, based on Mr. Cooper's initial reaction of pulling away from me, that I would be met with resistance in getting Mr. Cooper off the couch to the floor.

36. I then pulled Mr. Cooper forward towards the floor in front of the couch. In doing this I placed my right knee on the floor next to where Mr. Cooper was coming towards the floor.

37. Mr. Cooper came forward and went to the floor with no resistance, did not break his fall, and landed face down on the floor.

38. Once Mr. Cooper was on the floor I placed my left knee on the floor.

39. I then placed handcuffs on Mr. Cooper.

40. Sheriff Kent Simpson placed Ricky Crank in handcuffs after he went to the ground.

41. Officer Teague Liming stepped over to where Sadie Teakell was on the floor in front of the couch and placed her in handcuffs.

42. Once Mr. Crank, Mr. Cooper and Ms. Teakell were handcuffed, Sheriff Kent Simpson and Officer Liming cleared the rest of the house to make sure there was no one else present. I stayed in the front room to watch the handcuffed subjects.

43. After the rest of the house was cleared to make sure no other persons were in the house, I placed Mr. Cooper back onto the couch where he was originally.

44. Mr. Crank was also placed in a chair and Ms. Teakell also went back on the couch where she had been originally.

45. Sheriff Simpson and Officer Liming then began searching the residence.

46. Sometime after being placed on the couch Mr. Cooper complained to me that his handcuffs were too tight.

47. In response to Mr. Cooper's complaint, I had him lean forward so I could reach down and check the tightness of the handcuffs. I could place my finger in between the handcuff and Mr. Cooper's wrist, indicating to me the handcuffs were not too tight.

48. After some time passed, I noticed that Mr. Cooper was unresponsive.

49. My radio battery was dead, so I stepped outside and told Officer Lehew that an ambulance was needed because Mr. Cooper was unresponsive.

50. I stood by until Mr. Cooper was loaded into an ambulance and transported to the hospital.

51. After the search of the house was concluded, I went to the police station to review my body worn camera recording and discovered the camera had not recorded any part of the incident.

50. I stood by until Mr. Cooper was loaded into an ambulance and transported to the hospital.

51. After the search of the house was concluded, I went to the police station to review my body worn camera recording and discovered the camera had not recorded any part of the incident.

52. I did not do anything that would cause my body worn camera recording to be destroyed or deleted.

53. I used my own law enforcement experience and training in deciding whether to use physical force and how to do so with Dudley Cooper when he did not respond to our orders upon entry to the residence, when he was on the couch.

54. Sheriff Simpson did not give me any direction or orders regarding how to control the subjects inside the house at the time the search warrant was served. I relied on my own law enforcement experience and training.

55. Based on my training and experience, it is customary and standard for law enforcement officers to detain occupants of a residence in handcuffs while officers are executing a search warrant. This is for the safety of the occupants and the officers. There does not have to be any specific risks particular to the occupants for this detention by handcuffing to be carried out.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Kesto Simpson

Subscribed and sworn to before me this 27th day of November, 2020.

My Commission Expires:
May 13, 2023

_____
Notary Public

[Notary seal: JESSICA THOMPSON, NOTARY, COMM. #19004945, EXP. 5-13-2023, PUBLIC, STATE OF OKLAHOMA]