IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ERIC COOPER, as the Personal Representative of the Estate of Michael Dudley Cooper, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-18-1060-J |
| KESTO SIMPSON, *et al.*, | ) ) | |
| Defendants. | ) ) | |

---

**DEFENDANT CITY OF WALTER'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

Stephen L. Geries, OBA No. 19101
Taylor M. Riley, OBA No. 33291
COLLINS ZORN & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: slg@czwlaw.com
tmr@czwlaw.com

***ATTORNEYS FOR DEFENDANT
CITY OF WALTERS***

December 1, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES.................................................................................... ii-iii

LIST OF EXHIBITS ................................................................................................iv-v

LCvR 56.1(b) STATEMENT ....................................................................................... 1

ARGUMENT AND AUTHORITY ............................................................................ 15

STANDARD OF REVIEW........................................................................................ 15

I.     Defendant City is entitled to Summary Judgment With Regard to Plaintiff's
42 U.S.C. § 1983 Claims........................................................................................ 16

     A.     Underlying Violation.................................................................................. 17

     B.     Policy, Practice or Custom ........................................................................ 18

     C.     Failure to Train.......................................................................................... 21

CERTIFICATE OF SERVICE..................................................................................24-25

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) ........................ 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................... 15

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) ........................................ 22

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*,
   520 U.S. 397 (1997) ....................................................................................... 16, 17

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010) ........... 18

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) ................................................. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 15

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) ............................. 19

*City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412
   (1989) ............................................................................................................ 21, 22

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791
   (1985) ................................................................................................................. 17

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) ............................................. 16

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994) ............ 15

*Connick v. Thompson*, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ...................... 21

*Farmer v. Brennan*, 511 U.S. 825 (1994) ......................................................... 22

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) .............................................. 16

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) ........................... 17, 18

*Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996) ................................ 19

*Livsey v. Salt Lake County*, 275 F.3d 952 (10th Cir. 2001) .............................. 18

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999) ........................................... 22

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003)...................................................................... 19

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).................... 16, 17

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986) ...................................................................... 16

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996)............................. 16

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006)................................................... 18

## FEDERAL STATUTE AND RULE

42 U.S.C. § 1983 ....................................................................................................... 16, 19, 21

Fed. R. Civ. P. 56(a) ....................................................................................................... 1, 15

# LIST OF EXHIBITS

Exhibit 1 – Deposition of Kesto Simpson

Exhibit 2 – Affidavit of Kesto Simpson

Exhibit 3 – Kesto Simpson Statement

Exhibit 4 – Ben Lehew Statement

Exhibit 5 – Deposition of Ben Lehew

Exhibit 6 – Teague Liming Statement

Exhibit 7 – Deposition of Michael Flanagan

Exhibit 8 – Affidavit for Search Warrant

Exhibit 9 – Search Warrant

Exhibit 10 – Deposition of Teague Liming

Exhibit 11 – Diagram of property

Exhibit 12 – Walters Police Department Activity Log

Exhibit 13 – Deposition of Sadie Teakell

Exhibit 14 – Photos of Scene

Exhibit 15 – Photo of Michael Dudley Cooper

Exhibit 16 – Ambulance Run Report **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 17 – Medical Records of Michael Dudley Cooper **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 18 – Walters Police Department Policy 100.5 **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 19 – Walters Police Department Policy 300 **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 20 – Walters Police Department Policy 301 **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 21 – Walters Police Department Policy 606 **(filed under seal pursuant to Court's Order [Dkt. 90])**

Exhibit 22 – CLEET Profile of Kesto Simpson

Exhibit 23 – Declaration of Tommy Stranahan

Exhibit 24 – CLEET Profile of Ben Lehew

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

ERIC COOPER, as the Personal )
Representative of the Estate of Michael )
Dudley Cooper, Deceased, )
                                  )
                 Plaintiff, )
                                  )
v. )         Case No. CIV-18-1060-J
                                  )
KESTO SIMPSON, *et al.*, )
                                  )
                 Defendants. )

## DEFENDANT CITY OF WALTERS' MOTION
## FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant City of Walters requests that the Court grant summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56(a) with regard to Plaintiff's claims against it. In support thereof, Defendant City submits the following Brief:

## LCvR 56.1(b) STATEMENT

1.     On the evening of March 10, 2018, Walters Police Department Officer Kesto Simpson was off duty when he was contacted by phone by his father, Cotton County Sheriff Kent Simpson.  Kent Simpson requested assistance in the service of a search warrant for guns that were taken in a burglary.  The search warrant was for a residence located in the Town of Walters, 515 W. Nebraska.  (Ex. 1, Kesto Simpson Depo., p. 27:15 – p. 28:23, p. 35:1-10, p. 40:1-8, p. 41:1-8; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement).

2.     Kesto Simpson then contacted the Walters Police Chief, Tommy Stranahan, to obtain permission for him and other Walters officers to assist Sheriff Kent Simpson in

the service of the warrant.  (Ex. 1, Kesto Simpson Depo., p. 37:7 – p. 38:25; Ex. 2, Affidavit of Kesto Simpson).

3.        Kesto Simpson then spoke to the Walters officer on duty at the time, Ben Lehew, and advised him of the search warrant.  (Ex. 1, Kesto Simpson Depo., p. 41:21-23, p. 42:16 – p. 43:4; Ex. 2, Affidavit of Kesto Simpson; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 9:24 – p. 10:22, p. 15:11 – p. 16:7, p. 17:4-12).

4.        Kesto Simpson also contacted off-duty Walters officer Teague Liming and asked him to assist in the service of the search warrant.  (Ex. 1, Kesto Simpson Depo., p. 43:7-16; Ex. 2, Affidavit of Kesto Simpson; Ex. 6, Liming Statement).

5.        Kesto Simpson received a second phone call from Sheriff Kent Simpson and was advised he was going to get the search warrant signed. (Ex. 1, Kesto Simpson Depo., p. 39:2-25; Ex. 2, Affidavit of Kesto Simpson; Ex. 7, Flanagan Depo., p. 18:10-18, p. 21:13 – p. 22:9, p. 23:4-17; Ex. 8, Affidavit for Search Warrant; Ex. 9, Search Warrant).

6.        Sheriff Kent Simpson and Officers Kesto Simpson, Ben Lehew and Teague Liming all met in the parking lot of the Cotton County Sheriff's Department.  (Ex. 1, Kesto Simpson Depo., p. 46:15-24; Ex. 2, Affidavit of Kesto Simpson; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 17:15-21, p. 21:15-25; Ex. 10, Liming Depo., p. 37:24 – p. 38:23).

7.        While in the parking lot there was a brief conversation about where they were going, that there were weapons involved, that there were probably four persons in the house and where each officer was going to go when they arrived. (Ex. 1, Kesto

Simpson Depo., p. 47:10-15; Ex. 2, Affidavit of Kesto Simpson; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 23:20 – p. 24:21; Ex. 10, Liming Depo., p. 37:24 – p. 38:23).

8.      Officer Ben Lehew drew a diagram of the layout of the house and where an out-building was located.  (Ex. 1, Kesto Simpson Depo., p. 52:12-25; Ex. 2, Affidavit of Kesto Simpson; Ex. 5, Lehew Depo., p. 24:1-21; Ex. 11, Diagram of property).

9.      The address they were going to was 515 W. Nebraska.  (Ex. 1, Kesto Simpson Depo., p. 40:1-8, p. 41:1-8; Ex. 2, Affidavit of Kesto Simpson; Ex. 5, Lehew Depo., p. 9:24 – p. 10:22).

10.      Kesto Simpson was familiar with the residence due to a previous history of violence of the occupants residing at the location. Kesto Simpson believed the service of the search warrant was a high-risk operation due to the warrant being a search for guns and the history of violence at the location. Because of the history of violence at that residence, the Walters Chief of Police had previously directed that at least two officers be present when responding to calls at that residence. (Ex. 1, Kesto Simpson Depo., p. 47:16 – p. 48:23, p. 204:3-13; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 5, Lehew Depo., p. 20:6-20, p. 21:3-6, p. 112:12-25).

11.      Prior to going to serve the warrant, the Walters' officers did not review the search warrant affidavit or the search warrant itself.  (Ex. 1, Kesto Simpson Depo., p. 49:21 – p. 50:11, p. 51:1-21; Ex. 2, Affidavit of Kesto Simpson; Ex. 5, Lehew Depo., p. 27:12-22, p. 31-12 – p. 32:18).

12.      Prior to going to serve the warrant it was believed Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell would be at the house at 515 W. Nebraska. (Ex.

1, Kesto Simpson Depo., p. 60:24 – p. 61:6; Ex. 2, Affidavit of Kesto Simpson; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 24:24 – p. 25:18).

13.     Prior to going to serve the warrant no one told Officer Kesto Simpson where the stolen guns were supposed to be located. (Ex. 1, Kesto Simpson Depo., p. 123:15-21, p. 203:8 – p. 204:2; Ex. 2, Affidavit of Kesto Simpson; Ex. 5, Lehew Depo., p. 47:3-7).

14.     Officer Kesto Simpson knew who Heath Teakell, Ricky Crank, Dudley Cooper and Sadie Teakell were prior to March 10, 2018.  (Ex. 1, Kesto Simpson Depo., p. 61:9-17, p. 61:5 – p. 62:5, p. 62:22 – p. 63:10; Ex. 2, Affidavit of Kesto Simpson).

15.     Prior to March 10, 2018, Officer Kesto Simpson had never arrested Dudley Cooper or had official on-duty contact with him while serving as a law enforcement officer.  (Ex. 1, Kesto Simpson Depo., p. 62:6-16; Ex. 2, Affidavit of Kesto Simpson).

16.     The officers arrived at 515 W. Nebraska just after midnight.  (Ex. 1, Kesto Simpson Depo., p. 66:6-9; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 10, Liming Depo., p. 81:3-10; Ex. 12, Walters Police Department Activity Log).

17.     Upon arrival Sheriff Simpson and Officer Kesto Simpson went to the door of an out-building and announced "Police Department." No one was in the out-building so Sheriff Simpson and Officer Kesto Simpson proceeded to the front door of the residence.  Officer Lehew remained in the backyard to cover the rear perimeter. (Ex. 1, Kesto Simpson Depo., p. 71:1-6, p. 72:9 – p. 73:2, p. 74:16 – p. 75:20; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 5, Lehew

Depo., p. 35:17 – p. 36:7; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 76:25 – p. 77:13, p. 96:15-22).

18.     Prior to Sheriff Simpson and Officer Kesto Simpson reaching the front door, Sadie Teakell noticed "cop cars" down the street and announced that to Mr. Crank and Mr. Cooper.  (Ex. 13, Teakell Depo., p. 55:20 – p. 57:16).

19.     Ricky Crank got up and went to the door at about the same time Sheriff Simpson and Officer Kesto Simpson arrived at the front door.  (Ex. 1, Kesto Simpson Depo., p. 81:16-20; Ex. 3, Kesto Simpson Statement; Ex. 13, Teakell Depo., p. 57:17-20).

20.     When the door opened Kesto Simpson announced it was the "Police Department."  (Ex. 1, Kesto Simpson Depo., p. 79:11 – p. 80:7, p. 81:24 – p. 82:9; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 42:12-25; Ex. 10, Liming Depo., p. 98:3-11).

21.     Ricky Crank backed up from the door and Kesto Simpson said "Search warrant.  Get on the ground." Kesto Simpson said this two or three times before Mr. Crank complied.  (Ex. 1, Kesto Simpson Depo., p. 81:24 – p. 82:1, p. 82:19 – p. 83:12; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 99:1-11; Ex. 13, Teakell Depo., p. 58:2-5, p. 59:5-10, p. 62:19-25).

22.     Sheriff Kent Simpson also issued commands for the subjects in the room to get on the ground. (Ex. 1, Kesto Simpson Depo., p. 83:13-20; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement; Ex. 13, Teakell Depo., p. 58:2-5, p. 59:5-10, p. 62:19-25).

23.     As Sheriff Simpson and Kesto Simpson entered, Sheriff Simpson was on the left and Kesto Simpson was on the right, and Officer Teague Liming was behind them. (Ex. 1, Kesto Simpson Depo., p. 86:2-25; Ex. 2, Affidavit of Kesto Simpson; Ex. 10, Liming Depo., p. 96:23 – p. 97:20).

24.     Directly to the right of the front door there was a couch up against the wall with two people sitting on each end.  Nearest the front door is where Dudley Cooper was seated and at the other end Sadie Teakell was seated.  (Ex. 1, Kesto Simpson Depo., p. 87:1-25; Ex. 2, Affidavit of Kesto Simpson; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 107:12-17).

25.     Sadie Teakell went to the floor in front of the couch about the same time as Ricky Crank went to the floor. (Ex. 1, Kesto Simpson Depo., p. 89:7-14; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 13, Teakell Depo., p. 59:5-12, p. 62:16-18).

26.     Dudley Cooper did not go to the floor and another order to get on the floor was announced but Mr. Cooper still did not move. Kesto Simpson could see the left side of Mr. Cooper's face, but could not see Dudley Cooper's right side, including his right hand.  (Ex. 1, Kesto Simpson Depo., p. 91:18 – p. 92:10, p. 93:1-9, p. 97:2-3; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 10, Liming Depo., p. 107:19-25; Ex. 13, Teakell Depo., p. 63:1-12).

27.     At that time, Kesto Simpson reached down to grab his left arm which was resting on the arm of the couch to place him in an arm bar so he could place him on the floor to be handcuffed for officer safety. (Ex. 1, Kesto Simpson Depo., p. 91:5-8, p. 99:9

– p. 100:18; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 10, Liming Depo., p. 107:20-23).

28.     Mr. Cooper pulled away from Officer Kesto Simpson to the right.  (Ex. 1, Kesto Simpson Depo., p. 100:12 – p. 101:12; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 107:20 – p. 108:2, p. 109:14 – p. 110:12, p. 111:23-25).

29.     Officer Kesto Simpson then reached again and, with his left hand, got a firm grip on Mr. Cooper's left wrist and put his right hand on the back of the upper part of Mr. Cooper's left arm above the elbow, placing Mr. Cooper in an arm bar.  (Ex. 1, Kesto Simpson Depo., p. 102:20 – p. 105:10; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 108:3-4, p. 112:7-18).

30.     Officer Kesto Simpson then moved Mr. Cooper forward to place him on the floor.  (Ex. 1, Kesto Simpson Depo., p. 105:11 – p. 106:23; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 108:3-4, p. 112:7-18).

31.     The arm bar technique was a maneuver Kesto Simpson was taught while he was in the Reserve CLEET academy in the control and custody block in 2008. Kesto Simpson performed the arm bar maneuver in accordance with the training he received at CLEET.   (Ex. 1, Kesto Simpson Depo., p. 98:23 – p. 99:4; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 6, Liming Statement).

32.     Officer Kesto Simpson believed, based on Mr. Cooper's initial reaction of pulling away from him, that he would be met with resistance in getting Mr. Cooper off the couch to the floor.  (Ex. 2, Affidavit of Kesto Simpson).

33.     Ms. Teakell heard Mr. Cooper hit the floor, which caused her to then look over at him.  (Ex. 13, Teakell Depo., p. 63:25 – p. 64:9).

34.     Officer Kesto Simpson pulled Mr. Cooper forward towards the floor in front of the couch.  In doing this Officer Kesto Simpson placed his right knee on the floor next to where Mr. Cooper was coming towards the floor.  (Ex. 2, Affidavit of Kesto Simpson).

35.     Mr. Cooper came forward and went to the floor with no resistance, did not break his fall, and landed face down on the floor. (Ex. 1, Kesto Simpson Depo., p. 110:18-20; Ex. 2, Affidavit of Kesto Simpson).

36.     Once Mr. Cooper was on the floor, Officer Kesto Simpson placed his left knee on the floor. (Ex. 1, Kesto Simpson Depo., p. 109:9-11; Ex. 2, Affidavit of Kesto Simpson).

37.     Officer Kesto Simpson then placed handcuffs on Mr. Cooper.  (Ex. 1, Kesto Simpson Depo., p. 108:14 – p. 109:5, p. 110:9-15; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 10, Liming Depo., p. 113:5-7; Ex. 13, Teakell Depo., p. 64:23-25).

38.     Sheriff Kent Simpson placed Ricky Crank in handcuffs after he went to the ground.  (Ex. 1, Kesto Simpson Depo., p. 113:5-9; Ex. 2, Affidavit of Kesto Simpson; Ex. 10, Liming Depo., p. 102:1-17).

39.     Officer Teague Liming stepped over to where Sadie Teakell was on the floor in front of the couch and placed her in handcuffs. (Ex. 1, Kesto Simpson Depo., p. 113:13-18; Ex. 2, Affidavit of Kesto Simpson; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 105:2-8, p. 108:5-10).

40.     Once Mr. Crank, Mr. Cooper and Ms. Teakell were handcuffed, Sheriff Kent Simpson and Officer Liming cleared the rest of the house to make sure there was no one else present.    Officer Kesto Simpson stayed in the front room to watch the handcuffed subjects. (Ex. 1, Kesto Simpson Depo., p. 114:21 – p. 115:10, p. 116:6-8; Ex. 2, Affidavit of Kesto Simpson; Ex. 10, Liming Depo., p. 113:20 – p. 114:11, p. 114:25 – p. 115:6).

41.     After the rest of the house was cleared, Officer Kesto Simpson placed Mr. Cooper back onto the couch where he was originally. Simpson did not observe any signs of physical injury to Mr. Cooper at that time. (Ex. 1, Kesto Simpson Depo., p. 116:21 – p. 117:2, p. 118:8 – p. 120:5, p. 121:10-18; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 10, Liming Depo., p. 88:9-20, p. 114:12-24; Ex. 14, Photos of Scene).

42.     Mr. Crank was also placed in a chair and Ms. Teakell also went back on the couch where she had been originally. (Ex. 1, Kesto Simpson Depo., p. 116:21-24; Ex. 2, Affidavit of Kesto Simpson; Ex. 10, Liming Depo., p. 88:9-20, p. 114:12-24; Ex. 14, Photos of Scene).

43.     Sheriff Simpson and Officer Liming then began searching the residence. (Ex. 2, Affidavit of Kesto Simpson; Ex. 6, Liming Statement; Ex. 10, Liming Depo., p. 88:1-20).

44.     After being placed on the couch, Mr. Cooper complained to Officer Kesto Simpson that his handcuffs were too tight. (Ex. 1, Kesto Simpson Depo., p. 124:23 – p. 125:4; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement).

45.     In response to Mr. Cooper's complaint, Officer Kesto Simpson had him lean forward so he could reach down and check the tightness of the handcuffs.  Officer Kesto Simpson could place his finger in between the handcuff and Mr. Cooper's wrist, indicating the handcuffs were not too tight.  (Ex. 1, Kesto Simpson Depo., p. 125:4-10; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement).

46.     After some time passed, Officer Kesto Simpson noticed that Mr. Cooper was unresponsive. (Ex. 1, Kesto Simpson Depo., p. 130:15 – p. 131:20, p. 133:15 – p. 134:14; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 15, Photo of Cooper).

47.     Officer Kesto Simpson's radio battery was dead, so he then stepped outside and told Officer Lehew that an ambulance was needed because Mr. Cooper was unresponsive.  (Ex. 1, Kesto Simpson Depo., p. 129:24 – p. 130:14, p. 134:15-19, p. 135:18-24; Ex. 2, Affidavit of Kesto Simpson; Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 5, Lehew Depo., p. 55:18 – p. 57:9, p. 58:4-14; Ex. 6, Liming Statement; Ex. 12, Walters Police Department Activity Log).

48.     Officer Lehew was outside in the front yard at the time Officer Kesto Simpson requested him to call for an ambulance and, prior to that, was not in a position to observe Mr. Cooper and was not aware of him being in any medical distress. (Ex. 5, Lehew Depo., p. 56:6-12, p. 65:15-25).

49.     An ambulance arrived shortly thereafter at approximately 12:48 p.m. on March 11, 2020.  (Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 16, Ambulance Run Report).

50.     After the house had been cleared, Officer Liming went outside and only made one brief re-entry into the house. Prior to the arrival of the ambulance, Officer Liming did not observe Mr. Cooper to be in any serious medical distress aside from an apparent busted lip and was not aware that he needed any emergency medical attention. (Ex. 10, Liming Depo., p. 115:12 – p. 120:1).

51.     Mr. Cooper was transported to Lawton, Oklahoma to the Comanche County Memorial Hospital.  He was diagnosed with a subdural hematoma and had surgery.  He passed away at 6:08 p.m. on March 12, 2018. (Ex. 3, Kesto Simpson Statement; Ex. 4, Lehew Statement; Ex. 6, Liming Statement; Ex. 12, Walters Police Department Activity Log; Ex. 16, Ambulance Run Report; Ex. 17, Medical Records).

52.     At the time of the subject incident, the Walters Police Department (WPD) had a policy which required all officers to observe and comply with every person's clearly established rights under the Oklahoma and United States Constitution. (Ex. 18, Policy 100.5).

53.     At the time of the subject incident, the WPD had a Use of Force policy which provides that an officer shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. The policy further provides that the ultimate objective of every law enforcement encounter is to avoid or minimize injury. (Ex. 19, Policy 300).

54.     The Use of Force policy sets forth several factors for the officer to consider in determining whether the use of force is reasonable including, but not limited to, the immediacy and severity of threat to officers or others, the conduct of the individual being confronted, the relative age, size, strength, and skill level of the individual compared to the officer, whether the individual is injured, exhausted, or fatigued, the effects of drugs or alcohol on the individual, and the individual's mental state or capacity. (Ex. 19, Policy 300).

55.     The Use of Force policy requires officers to obtain medical assistance for any person who exhibits signs of physical distress, has sustained a visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious. The policy provides that any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed. (Ex. 19, Policy 300).

56.     At the time of the subject incident, the WPD had a Handcuffing and Restraints policy which authorizes the use of restraint devices in accordance with the Use of Force policy and officer training. The policy provides that in situations where it is

reasonable to restrain a person who may, after brief investigation, be released without arrest, the use of restraints on detainees should continue only for as long as is reasonably necessary to ensure the safety of officers and others. The policy prohibits the use of restraint devices to punish, to display authority, or as a show of force. (Ex. 20, Policy 301).

57.     At the time of the subject incident, the WPD had a Warrant Service policy which provides that, depending on the facts and circumstances, it may be appropriate to control the movements of any or all persons present at a warrant service including those who may not be the subject of a warrant or suspected in the case. The policy provides that officers must be mindful that only reasonable force may be used in accordance with the Use of Force policy, and that as soon as it can be determined that an individual is not subject to the scope of a warrant and that no further reasonable suspicion or safety concerns exist to justify further detention, the person should be promptly released. (Ex. 21, Policy 606).

58.     At the time of the incident in March of 2018, Kesto Simpson was a CLEET certified law enforcement officer. He attended the CLEET Academy for reserve officers in 2008 and obtained his certification on May 7, 2008.   At the time of the subject incident, he had had numerous hours of CLEET training including training in the use of force, application of the arm bar maneuver, and the necessity of obtaining medical aid for individuals injured in an encounter. (Ex. 1, Kesto Simpson Depo., p. 23:23 – p. 25:7, p. 98:19 – p. 99:4; Ex. 2, Affidavit of Kesto Simpson; Ex. 22, Kesto Simpson CLEET profile; Ex. 23, Declaration of Tommy Stranahan).

59.     At the time of the incident in March of 2018, Ben Lehew was a CLEET certified law enforcement officer and had numerous hours of CLEET training including training in the use of force and the necessity of obtaining medical aid for individuals injured in an encounter. (Ex. 23, Declaration of Tommy Stranahan; Ex. 24, Lehew CLEET Profile).

60.     Prior to the events of this case and during his employment with the City of Walters Police Department, Kesto Simpson had never been sued for excessive force or failure to obtain medical assistance, had never been the subject of any complaints regarding the use of force or failure to obtain medical assistance, and had never had any disciplinary actions taken against him regarding the use of force or failure to obtain medical assistance. (Ex. 23, Declaration of Tommy Stranahan).

61.     Prior to the events of this case and during his employment with the City of Walters Police Department, Officer Ben Lehew had never been sued for failure to obtain medical assistance, had never been the subject of any complaints regarding the failure to obtain medical assistance, and had never had any disciplinary actions taken against him regarding the failure to obtain medical assistance. (Ex. 23, Declaration of Tommy Stranahan).

62.     Prior to the events of this case and during his employment with the City of Walters Police Department, Officer Teague Liming had never been sued for failure to obtain medical assistance, had never been the subject of any complaints regarding the failure to obtain medical assistance, and had never had any disciplinary actions taken

against him regarding the failure to obtain medical assistance. (Ex. 23, Declaration of Tommy Stranahan).

## ARGUMENT AND AUTHORITY

### STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id*. In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id*. A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Id*. at 530

(citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## PROPOSITION I:

### Defendant City is entitled to Summary Judgment With Regard to Plaintiff's 42 U.S.C. § 1983 Claims

Defendant City cannot be held liable under § 1983 based upon the doctrine of *respondeat superior* or vicarious liability. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95 (1978). In *Monell*, the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id*. at 694. The actions of the governmental entity must be the moving force behind the constitutional violation. *Id*. The Supreme Court has held that governmental liability for a constitutional violation "attaches where – and only where – the entity makes a deliberate choice to follow a course of action from among various alternatives." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).

Defendant City may not be held liable simply because it "employs a tortfeasor." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). Additionally, "[t]hat a plaintiff has suffered a deprivation of federal rights at

the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Id*. at 406-07. Rather, *Monell* requires Plaintiff to establish that a policy or custom of Defendant City exists and that it caused the alleged constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Furthermore, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. *Brown*, 520 U.S. at 408. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Id*. (emphasis added). Additionally, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405. Here, Plaintiff cannot demonstrate that the alleged violation of the Decedent's constitutional rights was caused by only policy, practice or custom of Defendant City.

### A. Underlying Violation

First and foremost, Plaintiff must show an underlying violation of the Decedent's constitutional rights by an agent, employee or officer of Defendant City before municipal liability can be imposed against it. In *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993), the Tenth Circuit Court of Appeals held that "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."

(Citations omitted.) This is so "regardless of whether the municipality's policies might have 'authorized' such harm." *Id.* (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006) (a plaintiff suing a county under section 1983 for the actions of one of its officers must demonstrate that a municipal employee committed a constitutional violation); *Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Cir. 2001) (defendants' actions did not violate constitutional rights and could not have caused the county to be held liable based on their actions). Here, Plaintiff cannot demonstrate an underlying violation of the Decedent's constitutional rights by any agent, employee or officer of Defendant City as set forth in Defendant Kesto Simpson's summary judgment motion filed contemporaneously herewith and which is incorporated herein by reference. Moreover, there was no underlying violation of the Decedent's constitutional rights by Officers Lehew or Liming. There is no evidence that either Lehew or Liming used any force on the Decedent and they were simply not aware that he was in any medical distress until after Defendant Kesto Simpson requested Lehew call for an ambulance. (Fact Nos. 48 and 50). As such, Defendant City is entitled to summary judgment with regard to Plaintiff's § 1983 claim.

## B. Policy, Practice or Custom

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations and internal quotation marks omitted).

In order for a municipality to be held liable for an un-official practice under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law...In order to establish a custom, the actions must be persistent and widespread ... practices of [city] officials." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal citations and quotation marks omitted). In determining what level of persistent and widespread conduct will be sufficient to establish municipal liability, it is clear that "normally random acts" and "isolated incidents" fall short. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). *See also Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999) (a "meager history of isolated incidents" is insufficient). Furthermore, the court in *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003), required evidence of "'numerous particular instances' of unconstitutional conduct."

However, Plaintiff cannot demonstrate that the alleged violations of the Decedent's constitutional rights were caused by any policy, practice or custom of Defendant City. To the contrary, at the time of the subject incident, Defendant City had policies in place which were developed to avoid such constitutional violations as alleged in this case. At the time of the subject incident, the Walters Police Department (WPD) had a policy which required all officers to observe and comply with every person's clearly established rights under the Oklahoma and United States Constitution. (Fact No. 52). At the time of the subject incident, the WPD also had a Use of Force policy which provides that officer shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. The policy further provides

that the ultimate objective of every law enforcement encounter is to avoid or minimize injury. (Fact No. 53).

The Use of Force policy sets forth several factors for the officer to consider in determining whether the use of force is reasonable including, but not limited to, the immediacy and severity of threat to officers or others, the conduct of the individual being confronted, the relative age, size, strength, and skill level of the individual compared to the officer, whether the individual is injured, exhausted, or fatigued, the effects of drugs or alcohol on the individual, and the individual's mental state or capacity. (Fact No. 54). The Use of Force policy requires officers to obtain medical assistance for any person who exhibits signs of physical distress, has sustained a visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious. The policy provides that any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed. (Fact No. 55).

At the time of the subject incident, the WPD had a Handcuffing and Restraints policy which authorizes the use of restraint devices in accordance with the Use of Force policy and officer training. The policy provides that in situations where it is reasonable to restrain a person who may, after brief investigation, be released without arrest, the use of restraints on detainees should continue only for as long as is reasonably necessary to ensure the safety of officers and others. The policy prohibits the use of restraint devices to punish, to display authority, or as a show of force. (Fact No. 56). At the time of the subject incident, the WPD also had a Warrant Service policy which provides that, depending on the facts and circumstances, it may be appropriate to control the

movements of any or all persons present at a warrant service including those who may not be the subject of a warrant or suspected in the case. The policy provides that officers must be mindful that only reasonable force may be used in accordance with the Use of Force policy, and that as soon as it can be determined that an individual is not subject to the scope of a warrant and that no further reasonable suspicion or safety concerns exist to justify further detention, the person should be promptly released. (Fact No. 57).

Clearly, the alleged violations of the Decedent's constitutional rights were not caused by these policies. Moreover, Plaintiff has no evidence of any persistent and widespread pattern of the use of excessive force or failure to obtain medical assistance by Defendant City's police officers that would support a claim of an informal unconstitutional custom or practice. *Cf. Connick v. Thompson*, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (holding that a pattern of similar constitutional violations is typically necessary to prove deliberate indifference). Accordingly, Defendant City is entitled to summary judgment to the extent that Plaintiff's § 1983 claims against it are premised upon allegations of the existence of unconstitutional policies, practices or customs.

### C. Failure to Train

There are limited circumstances where inadequacy in training can be a basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (citation omitted). Inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to

deliberate indifference..." to inmate rights. *City of Canton*, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id*. at 389. To establish deliberate indifference to a need for training, Plaintiff must show that Defendant City knew of and disregarded the substantial risk of inadequate training of Defendant Kesto Simpson. *Canton*, 489 U.S. at 388. It isn't enough to "show that there were general deficiencies in the…[City's] training program…" *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury. *Id*. To establish deliberate indifference, Plaintiff must show that Defendant City knew of and disregarded a substantial risk to the Decedent's safety and well-being. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm...In most instances, notice can be established by proving the existence of a pattern of tortious conduct... In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (citations omitted).

Here, Plaintiff cannot demonstrate a specific deficiency in the training of Defendant City's officers which was obvious and closely related to the alleged violations of Plaintiff's constitutional rights. To the contrary, the record amply demonstrates that

Officers Kesto Simpson and Ben Lehew were adequately trained. At the time of the incident in March of 2018, Kesto Simpson was a CLEET certified law enforcement officer. He attended the CLEET Academy for reserve officers in 2008 and obtained his certification on May 7, 2008. At the time of the subject incident, he had had numerous hours of CLEET training including training in the use of force, application of the arm bar maneuver, and the necessity of obtaining medical aid for individuals injured in an encounter. (Fact No. 58). Likewise, at the time of the incident, Ben Lehew was a CLEET certified law enforcement officer and had numerous hours of CLEET training including training in the use of force and the necessity of obtaining medical aid for individuals injured in an encounter. (Fact No. 59). Furthermore, while Officer Teague Liming was a new officer who was not CLEET certified and still lacked a great deal of training, Plaintiff cannot demonstrate that any lack of training on the part of Officer Liming caused any violation of the Decedent's constitutional rights. In that regard, there is no evidence that Liming used any force on the Decedent and he was simply not aware that the Decedent was in any medical distress until after Defendant Kesto Simpson requested Lehew call for an ambulance. (Fact No. 50).

Moreover, Plaintiff cannot demonstrate the existence of a prior, persistent pattern of similar constitutional violations by Defendant Kesto Simpson, or Officers Lehew or Liming which would have placed Defendant City on notice that they required additional or different training. (Fact Nos. 60-62). Consequently, Defendant City is entitled to summary judgment to the extent that Plaintiff's § 1983 claims against it are premised upon allegations of inadequate training.

WHEREFORE, premises considered, Defendant City of Walters respectfully requests the Court to grant summary judgment in its favor and to dismiss all of Plaintiff's claims against it with prejudice to the re-filing thereof.

Respectfully submitted,

s/ Stephen L. Geries
Stephen L. Geries, OBA No. 19101
Taylor M. Riley, OBA No. 33291
COLLINS ZORN & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: slg@czwlaw.com
tmr@czwlaw.com

ATTORNEYS FOR DEFENDANT
CITY OF WALTERS

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Stanley M. Ward
Woodrow K. Glass
Barrett T. Bowers
Tanner B. France
Ward & Glass, L.L.P.
1601 N.W. 36th Avenue, Suite 100
Norman, OK 73072

Bret Burns
Burns Law Office
519 W. Chickasha Avenue, Suite B
Chickasha, OK 73018

Renee Walker Gunkel
Preston M. Gunkel
Gunkel Law Group, PLLC
P.O. Box 1124
Altus, OK  73522

*Attorneys for Plaintiff*

James L. Gibbs, II
David D. Proctor
Seth D. Coldiron
Goolsby, Proctor, Heefner & Gibbs, PC
701 N. Broadway Avenue, Suite 400
Oklahoma City, OK  73102-6006

*Attorneys for Defendant Sheriff of Cotton County*

Robert S. Lafferrandre
Carson C. Smith
Pierce Couch Hendrickson
   Baysinger & Green, L.L.P.
1109 N. Francis
Oklahoma City, OK  73106

*Attorneys for Defendant Kent Simpson,*
*in his individual capacity*

Scott B. Wood
Wood, Puhl & Wood, P.L.L.C.
2409 E. Skelly Drive, Suite 200
Tulsa, OK  74103

*Attorney for Defendant Kesto Simpson*

s/ Stephen L. Geries
Stephen L. Geries