# IN THE UNITED STATE DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

ERIC COOPER, as the Personal )
Representative of the Estate of Michael )
Dudley Cooper, Deceased, )
                     Plaintiff, )
                                )
v. )     Case No. CIV-18-1060-J
                                )
KESTO SIMPSON, individually; )
THE CITY OF WALTERS, a )
municipal corporation; )
KENT SIMPSON, individually; )
JOHN DOES 1-10, individually; )
                                )
                Defendants. )

---

## DEFENDANT KENT SIMPSON'S
## MOTION FOR SUMMARY JUDGMENT

---

PIERCE COUCH HENDRICKSON BAYSINGER & GREEN, L.L.P.

Carson C. Smith, OBA #22303
Robert S. Lafferrandre, OBA #11897
109 N. Francis Avenue
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
csmith@piercecouch.com
rlafferrandre@piercecouch.com

*Attorneys for Defendant Kent Simpson*

December 1, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................ii

INDEX OF EXHIBITS .....................................................................................vi

I.  UNDISPUTED MATERIAL FACTS...............................................................1

II.  THE FOURTH AMENDMENT IS THE STANDARD, NOT
     OKLAHOMA LAW, FOR ANY PLED SECTION 1983 CLAIM ..................7

III.  A PRACTICAL, OBJECTIVE APPROACH SHOWS THE SUBJECT
      NIGHTTIME EXECUTION WAS VERY REASONABLE........................10

     A. The Totality of Facts show that the Nighttime Execution
        Was Reasonable......................................................................................12

     B. Governing Law Supports the Reasonableness of the
        Execution Timing ...................................................................................16

IV.  EVEN IF MISTAKEN, SIMPSON IS ENTITLED TO QUALIFIED
     IMMUNITY ON THE NIGHTTIME SEARCH..............................................17

     A. Plaintiff Has the Qualified Immunity Burden .......................................18

     B. *Arguable* Reasonableness In the Nighttime Execution Context.............19

V.  EVEN IF UNCONSTITUTIONAL, THE TIMING OF THE SEARCH
    BEARS NO VALID, CAUSAL LINK TO DEATH OF COOPER.................22

VI. SIMPSON WAS NOT DELIBERATELY INDIFFERENT TO ANY
    MEDICAL NEED OF COOPER'S ................................................................25

VII. KENT SIMPSON IS ENTITLED TO QUALIFIED IMMUNITY
     ON THE DENIAL OF MEDICAL CARE CLAIM........................................30

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.M. v. Holmes*,
830 F.3d 1123 (10th Cir. 2016) ............................................................. 17, 21
*Aldaba v. Pickens*,
844 F.3d 870 (10th Cir. 2016) ........................................................................ 30
*Anderson v. Creighton*,
483 U.S. 635 107 S. Ct. 3034 (1987) ..................................... 11, 19, 20, 21
*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*,
452 F.3d 1193 (10th Cir. 2006) ..................................................................... 29
*Ashcroft v. Iqbal*,
556 U.S. 662 129 S. Ct. 1937 (2009) ........................................................... 22
*Bedford v. United States*,
424 U.S. 917, 96 S. Ct. 1120, 47 L. Ed. 2d 323 (1976) ............................. 9
*Bennett v. Passic*,
545 F.2d 1260 (10th Cir. 1976) ..................................................................... 25
*Blackmon v. Sutton*,
734 F.3d 1237 (10th Cir. 2013) ..................................................................... 29
*Bletz v. Gribble*,
641 F.3d 743 (6th Cir.2011) .......................................................................... 23
*Bowling v. Rector*,
584 F.3d 956 (10th Cir. 2009) ......................................................................... 9
*Brigham City, Utah v. Stuart*,
547 U.S. 398, 126 S. Ct. 1943 (2006) .......................................................... 10
*Carey v. Piphus*,
435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) ................................ 24
*Case v. West Las Vegas Indep. Sch. Dist.*,
473 F.3d 1323 (10th Cir. 2007) ..................................................................... 18
*City & Cty. of San Francisco, Calif. v. Sheehan*,
575 U.S. 600, 135 S. Ct. 1765 (2015) .......................................................... 25
*Clark v. Edmunds*,
513 F.3d 1219 (10th Cir. 2008) ..................................................................... 18
*Coleman v. Turpen*,
697 F.2d 1341 (10th Cir. 1982) ..................................................................... 26
*Colony Nat. Ins. Co. v. Omer*,
No. 07-2123-JAR, 2008 WL 2309005 (D. Kan. June 2, 2008) ................... 29
*Cooper v. State of Cal.*,
386 U.S. 58, 87 S. Ct. 788 (1967) ................................................................ 10

*Cortez v. McCauley*,
   478 F.3d 1108 (10th Cir. 2007) ........................................................... 20
*Crittenden v. City of Tahlequah*,
   786 F. App'x 795 (10th Cir. 2019) ................................................... 27, 28
*Crow v. Montgomery*,
   403 F.3d 598 (8th Cir. 2005) ........................................................... 19, 30
*Crownover v. Bd. of Cty. Comm'rs of Ottawa County*,
   2010 WL 503110 (N.D. Okla. 2010) ........................................................ 9
*Eades v. Thompson*,
   823 F.2d 1055 (7th Cir. 1987) ......................................................... 25, 26
*Ernst v. Creek County*,
   697 Fed.Appx. 931 (10th Cir. June 19, 2017) ............................................ 9
*Estate of Booker v. Gomez*,
   745 F.3d 405 (10th Cir. 2014) ............................................................ 23
*Estate of Ceballos v. Husk*,
   919 F.3d 1204 (10th Cir. 2019) .......................................................... 30
*Felders ex rel. Smedley v. Malcom*,
   755 F.3d 870 (10th Cir. 2014) ............................................................ 20
*Garcia v. Escalante*,
   678 F. App'x 649 (10th Cir. 2017) ................................................... 20, 30
*Gomes v. Wood*,
   451 F.3d 1122 (10th Cir. 2006) .......................................................... 19
*Hopkins v. Bonvicino*,
   573 F.3d 752 (9th Cir. 2009) ............................................................. 23
*Illinois v. Gates*,
   462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ............................... 11
*Jones v. Williams*,
   297 F.3d 930 (9th Cir. 2002) ............................................................. 23
*Kingsley v. Hendrickson*,
   576 U.S. 389, 135 S. Ct. 2466 (2015) ................................................... 11
*Leer v. Murphy*,
   844 F.2d 628 (9th Cir. 1988) ............................................................. 24
*McCowan v. Morales*,
   945 F.3d 1276 (10th Cir. 2019) .......................................................... 29
*Medina v. City and County of Denver*,
   960 F.2d 1493 (10th Cir. 1992) .......................................................... 18
*Medina v. Cram*,
   252 F.3d 1124 (10th Cir. 2001) .......................................................... 10
*Moore v. Roberts*,
   2017 WL 1906953 (10th Cir. April 17, 2017) ........................................... 30
*Morrow v. Meachum*,
   917 F.3d 870 (5th Cir. 2019) ............................................................. 27

*Novitsky v. City of Aurora*,
  491 F.3d 1244 (10th Cir. 2007) .......................................................... 22, 26
*Otteson v. United States*,
  622 F.2d 516 (10th Cir. 1980) .................................................................. 29
*Pauly v. White*,
  874 F.3d 1197 (10th Cir. 2017) ................................................................ 30
*Perry v. Durborow*,
  892 F.3d 1116 (10th Cir. 2018) ................................................................ 19
*Plumhoff v. Rickard*,
  134 S. Ct. 2012 (2014)............................................................... 18, 19, 27
*Richards v. Wisconsin*,
  520 U.S. 385, 117 S. Ct. 1416 (1997) ..................................................... 11
*Romero v. Bd. of Cnty. Comm'rs*,
  60 F.3d 702 (10th Cir. 1995) ..................................................................... 9
*Salmon v. Schwarz*,
  948 F.2d 1131 (10th Cir. 1991) ................................................................ 21
*Saucier v. Katz*,
  533 U.S. 194, 121 S.Ct. 2151 (2001) ...................................................... 27
*Sealock v. Colorado*,
  218 F.3d 1205 (10th Cir. 2000) ................................................................ 29
*Smith v. LePage*,
  834 F.3d 1285 (11th Cir. 2016) ................................................................ 23
Strain v. Regalado,
  977 F.3d 984 (10th Cir. 2020) .................................................................. 25
*Swain v. Spinney*,
  117 F.3d 1 (1st Cir. 1997)......................................................................... 18
*Toevs v. Reid*,
  646 F. 3d 752 (10th Cir. 2011) ................................................................ 18
*United States v. Bedford*,
  519 F.2d 650 (3d Cir. 1975) ...................................................................... 9
*United States v. Callwood*,
  66 F.3d 1110 (10th Cir. 1995) .................................................................. 16
United States v. Carhee,
  27 F.3d 1493 (10th Cir.1994) ................................................................... 16
*United States v. Cortez*,
  449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ............................... 12
*United States v. Gibbons*,
  607 F.2d 1320 (10th Cir. 1979) ............................................................ 8, 12
*United States v. Gonzales*,
  535 F.3d 1174 (10th Cir. 2008) ................................................................. 9
*United States v. Millar*,
  543 F.2d 1280 (10th Cir. 1976) ................................................................. 9

*United States v. Rizzi*,
    434 F.3d 669 (4th Cir. 2006) ........................................................................ 8

*United States v. Tucker*,
    No. 00-40060-01/2-RDR, 2000 WL 1279464 (D. Kan. Sept. 1, 2000) .......... 8

*United States v. Ventresca*,
    380 U.S. 102, 85 S.Ct. 741 (1965) ................................................... 12, 13, 14

*Vinson v. City of Los Angeles*,
    CV 14-4488-PLA, 2015 WL 12750271 (C.D. Cal. May 19, 2015) ..................... 23, 24

*Watts v. Laurent*,
    774 F.2d 168 (7th Cir. 1985) ...................................................................... 24

*Whren v. United States*,
    517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ................................. 11

*Wilson v. Falk*,
    877 F.3d 1204 (10th Cir. 2017) ................................................................. 18

*Wilson v. Meeks*,
    52 F.3d 1547 (10th Cir. 1995) .............................................................. 27, 28

*Wilson v. Meeks*,
    98 F.3d 1247 (10th Cir. 1996) ................................................................. 26

*Youbyoung Park v. Gaitan*,
    2017 WL 782280 (10th Cir. Mar. 1, 2017) ................................................ 30

*Youngbey v. Mar.*,
    676 F.3d 1114 (D.C. Cir. 2012) ....................................................... 8, 10, 11

Rules

Fed.R.Civ.P. 10(c) ............................................................................................. 1
Fed.R.Civ.P. 56(a) ............................................................................................. 1
Fed.R.Civ.P. 56(c) ........................................................................................... 29

Other Authorities

22 O.S. 1230 .................................................................................................... 14

# INDEX TO EXHIBITS

Exhibit 1      Search Warrant

Exhibit 2      Affidavit for Search Warrant

Exhibit 3      Deposition of Michael Flanagan

Exhibit 4      Deposition of Kesto Simpson

Exhibit 5      Deposition of Ben Lehew

Exhibit 6      Kenneth Jay Statement

Exhibit 7      Affidavit of Kesto Simpson

Exhibit 8      Deposition of Teague Liming

Exhibit 9      Deposition of Sadie Teakell

Exhibit 10     Declaration of Kent Simpson

Exhibit 11     Statement of Kesto Simpson

Exhibit 12     Text from Sparks to Judge

Defendant Kent Simpson, individually, pursuant to Fed.R.Civ.P. 56(a) and LCvR 56.1, hereby requests summary judgment and/or qualified immunity be granted to him as a matter of law on all of Plaintiff's claims pressed against him.

## I.  UNDISPUTED MATERIAL FACTS

Defendant Simpson hereby incorporates, under Fed.R.Civ.P. 10(c), the undisputed material facts set out in Defendant Cotton County's Motion for Summary Judgment [Doc. 86].  The facts below are additional to those so incorporated.

1.  The affidavit for search warrant sets out information learned by Sheriff Simpson during the course of his investigation into a burglary into a local resident's home, during which guns and other items were stolen. [Affidavit for SW and attachments, Ex. 2].

2.  In addition to interviewing witnesses with first-hand knowledge of events and obtaining statements from them, Simpson was given information by a local resident Don Mejia, which information correlated with the information and accounts obtained by Simpson from interviews.  [Depo of D. Mejia, pg. 14:8-17; pg. 23:1 – pg. 24:16, Ex. 13]

3.  The subject search warrant does not expressly limit, on the face of the warrant, the service of it to only daytime service. [Search Warrant, Ex. 1].

4.  Sheriff Simpson presented the Affidavit for Search Warrant, requesting to search "at any time of day or night," to Judge Flanagan late on the night of March 10, 2018, and the Judge signed that Affidavit at 11:41pm.  Judge signed the search warrant just after signing the affidavit at that time.  [Affidavit for SW and attachments, Ex. 2]; [Flanagan Depo, pg. 27:8-25; pg. 28:1-17, Ex. 3]; [Search Warrant, Ex. 1].

5.  The search warrant commands "an immediate search." [Search Warrant]. It reads:

An Affidavit having been sworn to by Affiant    KENT SIMPSON    of the

COTTON COUNTY SHERIFF OFFICE    before me this day, based upon facts stated herein,

probable cause having been found, I command you to make immediate search for the following described

property and things, and if you find the same or any part thereof to bring it forthwith before me at my

office at    COTTON    , Oklahoma.

6. Before leaving the Sheriff's Department parking lot that night, Kent Simpson, Kesto Simpson and Ben Lehew all knew that the suspects had already attempted to sell, earlier that day, some of the stolen guns to be sought as part of the search warrant. [Affidavit for SW, Ex. 2]; [Depo of Kesto S., pg. 35:1-10, Ex. 4]; [Depo of B. Lehew, pg. 16:1-7, pg. 116:5 – pg. 117:9, Ex. 5]; [Search Warrant, Ex. 1].

7. Judge Flanagan testified that at the time of 11:41 pm on March 10, 2018, from the totality of the circumstances, including the investigation facts; some guns already having been sold; the late-night timing of the presentation and signing of the affidavit and search warrant; and the express content of the two, that it is <u>highly likely</u> Kent Simpson thought that he had the Judge's approval for a nighttime search as he left the Judge's house that night. [Depo of Judge Flanagan, pg. 40:1 – pg. 41:-11; 48:5-25, Ex. 3]

8. Kenneth Jay, a local resident, admitted to buying two of the guns, which Teakell and Crank had just retrieved from a ditch at night, in a statement to the Cotton County Sheriff's Office. [Jay Statement, Ex. 6]; [Affidavit for SW, Ex. 2].

9. The fact that stolen property had *already been sold* suggests to law enforcement that the perpetrators would be trying to sell other stolen property, i.e. that such property will very likely be in the process of being sold and moved or concealed. Judge Flanagan agreed that this would be the analysis relative to timing of service of the warrant. [Depo

of Judge Flanagan, pg. 33:8 – pg. 34:18, Ex. 3].

10. Officer Lehew recalls Kent Simpson, prior to the execution of the warrant, talking about the fact that guns had already been sold, and there was a discussion amongst officers as to this fact. [Depo of B. Lehew, pg. 16:1-7; pg. 110:17- pg. 111:19, Ex. 5].

11. Officer Lehew testified that this circumstance, of stolen guns being moved, warranted searching quickly, as "you're going to lose evidence if you don't move quickly." [Depo of B. Lehew, pg. 16:1-7; pg. 117:10-18, Ex. 5].

12. The Cotton County Sheriff's Office and City of Walters had a working law enforcement relationship, especially with activity within the town of Walters. [Depo of Kesto S., pg. 35:22- pg. 36:2, Ex. 4]; [Declaration of Kesto Simpson, ¶ 7 Ex. 7].

13. The Cotton County Sheriff's Department only had two deputies at the time: Sheriff Kent Simpson and Undersheriff Bobby Sparks. [Depo of Kesto S., pg. 38:10-12].

14. The City of Walters officers assisted Kent Simpson with the service of the search warrant; Lehew considered it a joint operation. [Depo of B. Lehew, pg. 17:1-15, Ex. 5].

15. The residence subject to the search warrant had a reputation with officers, as the City of Walters police chief had given orders for an officer not to go to the house alone. This was based on a history of violence, including several prior incidents such as Heath Teakell barricading himself in the outbuilding with a machete, an emergency order of detention, and fighting. [Depo of Kesto S., pg. 48:13-21, pg. 204:3-13, Ex 4]; [Statement of Kesto S, Ex. 11]; [Depo of B. Lehew, pg. 18:23- pg. 19:6, Ex. 5].

16. At the meeting in the Sheriff's Department parking lot, Ben Lehew, City of Walters officer, along with Sheriff were doing most of the talking. [Depo of Kesto S., pg.

50:10-18, Ex. 4]. Lehew was the one who devised the method and plan for serving the warrant and sketched out the house on a piece of paper. [*Id.*, pg. 50:16-18]; [Depo of B. Lehew, pg. 25-26]. According to Lehew, Kent Simpson played no role in formulating the entry plan. [Depo of B. Lehew, pg. 25:19 – pg. 26:18, Ex. 5]

17. The law enforcement officers jointly discussed how to secure the perimeter of the residence. [Depo of B. Lehew, pg. 26:19-25, Ex. 5].

18. Kent Simpson did not give any directions as to how to physically secure the occupants upon entry to the house or when or how to use physical contact with them in the event occupants were not compliant with orders upon entry or during the process of the search. [Affidavit of Kesto S., ¶ 54, Ex. 7].

19. Kesto Simpson relied solely on his own training and experience in deciding when and how to use physical contact with Dudley Cooper, during the search warrant execution. [Affidavit of Kesto S., ¶¶ 33-35, 53-55, Ex. 7].

20. Kesto was trained in the arm bar technique in 2008 at CLEET, and he applied this technique to Cooper at the residence. [Depo of Kesto S., pg. 98:19 – pg. 99:4, Ex. 4]; [Affidavit of Kesto S., ¶¶ 33-34, Ex. 7].

21. Before physically contacting Cooper, Kesto made the decision that he did not need any assistance from Sheriff Simpson or from any other officer in addressing Cooper and securing his compliance. [Depo of Kesto S., pg. 96:16-23, Ex. 4]

22. Kesto Simpson had no conversations with Sheriff Simpson after Kesto got out of his vehicle in arriving at the subject residence, prior to entry. [*Id.*, pg. 70:17-22, Ex 4.].

23. Before going to the subject residence, the officers believed that four persons

would be at the residence. [Depo of Kesto S., pg. 65:16-22, Ex. 4].

24. The officers believed that several missing, stolen guns would be in the residence along with the individual occupants believed to be there. [*Id.*, pg. 65:16-22, Ex. 4]; [Depo of B. Lehew, pg. 16:1-7, Ex. 5].

25. During the time that Kesto was addressing Cooper and placing him on the ground, Kent Simpson was handling Ricky Crank and placing him in handcuffs. [Depo of Kesto S., pg. 113:5-9, Ex. 4]. This occurred in a different area than in front of the couch where Cooper was seated. [Depo of T. Liming, pg. 98:16-24, Ex. 8].

26. Kent Simpson did not physically touch Dudley Cooper at all when he was on the couch. Kesto was the only one to contact him and place him on the ground. [Depo of Sadie Teakell, pg. 133:2-8, Ex. 9].

27. After all the occupants had been handcuffed and secured, Kent Simpson and Liming proceeded through the rest of the house and property to clear it before searching, announcing "search warrant" as they were moving throughout the house, out of view of Kesto in the living room with the occupants. [Depo of Kesto S., pg. 114:21- pg. 115:19].

28. While Kent and Liming were in other areas of the house and property, Kesto remained in the residence in the living room area, within sight of Cooper, and monitored the occupants. [Depo of Kesto S., pg. 114:21- pg. 115:19; pg. 117:3-15, Ex. 4]; [Affidavit of Kesto Simpson, ¶ 42, Ex. 7].

29. Kent Simpson was mainly engaged in clearing and searching the house and property, as another officer was with the occupants in the living room area. [*Id.*, pg. 114:21- pg. 115:19; pg. 117:3-15, Ex. 4]; [Declaration of Kent Simpson, Ex. 10, ¶ 1].

30. While the house was being cleared by Kent and Liming, the occupants remained on the ground. [Depo of Kesto S., pg. 116:17-20, Ex 4]. They were placed back on the couch once the house was cleared. [*Id.*, pg. 116:21 – pg. 117:7].

31. Officer Lehew did not have any communications with Kent Simpson before entering the residence. Kent Simpson did not order Lehew to enter or to undertake any investigatory role. Lehew decided to walk into the house on his own. [Depo of B. Lehew, pg. 76:22- pg. 77:13]

32. Kent Simpson came back into the living room area, after being in other parts of the property, and saw some officers around Cooper; one said something about getting help for him. This was the first time Kent had any indication something may be going on with Cooper. [Declaration of Kent Simpson, ¶¶ 3-4, Ex. 10].

33. The evidence is that Kent **either** asked about an ambulance due to the comment about help and was told that one had already been called and requested, **or** he himself directed one be called immediately after he viewed Cooper, in Sadie Teakell's memory. Under either account, Kent thus knew medical personnel were on their way to the residence right after becoming aware of any issue. [Declaration of Kent Simpson, ¶ 3-4, Ex. 10]; [Depo of Sadie Teakell, pg. 138:23- pg. 139:13, Ex. 9, respectively].

34. During the time officers were checking on Cooper, Sadie was telling officers that he was okay, that he was just drunk. [Depo of Sadie Teakell, pg. 139:14-18].

35. Kent did not see any blood on Cooper at this point in time when he first noticed any issue with Cooper, and it appeared he was breathing at the time. [Declaration of Kent Simpson, ¶ 5, Ex. 10].

36. Kent did not have any medical training that would make him qualified and able to provide medical care to someone with unknown internal conditions. [Declaration of Kent Simpson, ¶ 7, Ex. 10].

37. Between the time that Kesto determined Cooper was unresponsive and had Lehew request an ambulance, Kesto saw Kent Simpson going around searching the premises. [Depo of Kesto S., pg. 160:17-24, Ex. 4]. Lehew believes Kent was searching the outbuilding before the ambulance arrived, when Lehew was inside the residence. [Depo of B. Lehew, pg. 77:15- pg. 78:10, Ex. 5].

38. Lehew was concerned about Cooper's health but knew that EMS was in route and did not know what Cooper needed medically. [*Id.*, pg. 79:10-21, Ex. 5]

39. Undersheriff Sparks communicated with Judge Flanagan on Saturday afternoon March 10, 2018, advising him of the investigation and the need to get a warrant. Judge Flanagan advised he could come by after-hours on a Saturday night. [Depo of Judge Flanagan, pg. 15:4-13, Ex. 3]; [Text Message from Sparks, Ex. 12].

## II. THE FOURTH AMENDMENT IS THE STANDARD, NOT OKLAHOMA LAW, FOR ANY PLED SECTION 1983 CLAIM

Plaintiff's Complaint generally faults Kent Simpson for unlawful entry in the process of executing the search warrant. [Complaint, ¶¶ 12-14, Doc. 1]. However, such claim is not pled clearly and plainly against him individually from the face of the Complaint. [Doc. 1, ¶¶ 53-55]. For this reason, Simpson in his individual capacity submits he is entitled to dismissal of any claim, *now alleged* by Plaintiff, stemming from alleged unlawful entry or nighttime service pressed against him in his <u>individual</u> capacity.

However, in an abundance of caution, Defendant will address the notion that Simpson individually is liable for an unlawful entry claim under the Fourth Amendment. There is no claim for state law negligence on the Complaint, and any such "illegal entry" claim, <u>if deemed pled adequately</u> by the Complaint, would sound under the Fourth Amendment only. Thus, Defendant addresses this concept as a Section 1983 Fourth Amendment claim if claim is *even found to lie*. Finally, Plaintiff does not allege any deficiency in the search warrant in terms of the underlying probable cause to support it. The claim is directed <u>solely to the timing</u> of the execution of it. [Complaint, ¶¶ 12-14].

As a starting point, Plaintiff's citation to Oklahoma state law [Complaint, ¶ 12, Doc. 1] for its provisions as to nighttime service is inapposite relative to the United States Constitution and federal law. *United States v. Rizzi*, 434 F.3d 669, 675 (4th Cir. 2006) states, "The Supreme Court, however, has never held that the Fourth Amendment prohibits nighttime searches." *Youngbey v. Mar.*, 676 F.3d 1114, 1124 (D.C. Cir. 2012) states, "[t]he Fourth Amendment does not include a specific protection against executing a warrant at night." The fact that Oklahoma law via an Oklahoma statute regulates nighttime searches does not stand in for a Section 1983 claim.

Under the proper Fourth Amendment, federal standard, a nighttime search is to be assessed for reasonableness, given all the pertinent facts and circumstances. *United States v. Tucker*, No. 00-40060-01/2-RDR, 2000 WL 1279464 (D. Kan. Sept. 1, 2000), aff'd, 313 F.3d 1259 (10th Cir. 2002), states "The Supreme Court and the Tenth Circuit have made it clear that the factor of a nighttime search is related to the reasonableness analysis under the Fourth Amendment." *United States v. Gibbons*, 607 F.2d 1320 (10th

Cir. 1979) ("[T]he factor of a nighttime search is sensitively related to the reasonableness issue.")  Nighttime searches implicate certain interests more than a daytime search.  Yet there is no bright-line, applicable rule that would *ipso facto* place a nighttime search beyond the margins of the Fourth Amendment and its crux of reasonableness.

Even a violation of 22 O.S. § 1230, under Oklahoma law, does not connect with the Fourth Amendment and a violation thereunder.  Cotton County and City of Walters officers were the only law enforcement involved here. *United States v. Millar*, 543 F.2d 1280, 1283 (10th Cir. 1976) ("If a search is a state search, with minimal or no federal involvement, the warrant need only to conform to federal constitutional requirements …"); *United States v. Bedford*, 519 F.2d 650, 653 (3d Cir. 1975) ("the warrant need only satisfy federal constitutional **requirements rather than those of state law,** which may involve stricter standards. … The test is whether the fourth amendment's imperatives have been observed"), *cert. denied, Bedford v. United States*, 424 U.S. 917, 96 S. Ct. 1120, 47 L. Ed. 2d 323 (1976)) (additional citation omitted).

The Tenth Circuit has been clear and consistent that "[a] state-law violation does not ... necessarily rise to the level of a federal constitutional violation" under the Fourth Amendment.  *Bowling v. Rector*, 584 F.3d 956, 966 (10th Cir. 2009) (quoting *United States v. Gonzales*, 535 F.3d 1174, 1182 (10th Cir. 2008)).  *Romero v. Bd. of Cnty. Comm'rs*, 60 F.3d 702, 704 (10th Cir. 1995) ("[V]iolations of state law and police procedure generally do not give rise to a § 1983 claim."); See also *Ernst v. Creek County*, 697 Fed.Appx. 931 (10th Cir. June 19, 2017); *Crownover v. Bd. of Cty. Comm'rs of Ottawa County*, 2010 WL 503110, at *7 (N.D. Okla. 2010) ("[T]he failure to comply

with a state law or regulation such as jail standards is not a constitution violation."), "Claims based on violations of state law and police procedure are not actionable under § 1983." *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001). *Bowling* states, "[T]he question ... **is not** whether the search was authorized by state law. The question is rather whether the search **was reasonable** under the Fourth Amendment." (emphasis added). *Id.* (quoting *Cooper v. State of Cal.*, 386 U.S. 58, 61, 87 S. Ct. 788, 790 (1967)).

As shown below, the service of the subject warrant satisfied the provisions and underlying policy of <u>both the state and federal laws</u>. However, only the latter forms a valid basis for any Fourth Amendment claim directed to Kent Simpson relative to the timing of the execution of the search warrant. The Oklahoma law, if anything, merely buttresses the reasonableness analysis and provides specific factors which underscore the reasonable nighttime execution under the circumstances of this investigation.

### III. A PRACTICAL, OBJECTIVE APPROACH SHOWS THE SUBJECT NIGHTTIME EXECUTION WAS REASONABLE

"The ultimate touchstone of the Fourth Amendment is 'reasonableness,'" states *Brigham City, Utah v. Stuart*, 547 U.S. 398, 126 S. Ct. 1943 (2006). This analysis naturally is a particularized and contextual one that must take in and consider all facts and circumstances bearing upon the decision to execute a search warrant at night. *Youngbey v. Mar*., 676 F.3d 1114, 1120 (D.C. Cir. 2012) states, "Thus, in determining whether the **manner of executing** a search warrant is consistent with the Fourth Amendment, neither the law enforcement officials nor reviewing courts may 'dispens[e] with **case-by-case evaluation" of the circumstances** particular to the search at hand.'"

(emphasis added)(citing *Richards v. Wisconsin*, 520 U.S. 385, 392, 117 S. Ct. 1416 (1997).  A detailed evaluation of the circumstances here shows the manner of executing the search warrant, at nighttime after the Judge had signed it, was reasonable.

As under *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015) in a different context, the operative standard for assessing a nighttime search is objective reasonableness.  *Youngbey v. Mar.*, 676 F.3d 1114, 1120 (D.C. Cir. 2012) states:

> When assessing the particular circumstances of a case, courts must apply **an objective standard of reasonableness**. See *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). 'Subjective intentions play no role in ordinary ... Fourth Amendment analysis.'

(emphasis added)(internal citations omitted).   This objective standard takes into account what the officers knew at the time, as informing the picture of the decision to execute the warrant at a certain time.  *Anderson v. Creighton*, 483 U.S. 635, 641 107 S. Ct. 3034 (1987) states, "It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require **examination of the information possessed by the searching officials**." (emphasis added).

Lastly, as the analysis concerns a search warrant, the evaluation of manner of service is undertaken in a pragmatic fashion, as with the analysis for probable cause to support the issuance of a warrant in the first place.  *Illinois v. Gates*, 462 U.S. 213, 231-32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) states:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a '**practical, nontechnical conception**.'… 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and **practical considerations of everyday** life

on which reasonable and prudent men, not legal technicians, act.'… Our observation in *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

> As these comments illustrate, probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

(emphasis added)(some internal citations omitted). The presumption of validity and the common-sense approach to the inquiry set the framework for analyzing the search warrant. This same common-sense approach is applied to the question of whether a valid warrant was served *in a valid manner*. *United States v. Gibbons*, 607 F.2d 1320, 1327 (10th Cir. 1979) states, "Considering the affidavit in a **commonsense, nontechnical manner**….we feel that the showing made **justified the nighttime** search authorized." (emphasis added)(internal citation omitted) (citing *United States v. Ventresca*, 380 U.S. 102, 108-109, 85 S.Ct. 741 (1965)). The same practical approach here yields the same result regarding the nighttime search under the pertinent circumstances.

**A. The Totality Of Facts Show That The Nighttime Execution Was Reasonable**

The following undisputed, material facts ("UMF") comprise a significant portion of the corpus of circumstances that collectively show the nighttime service of the subject warrant to have been reasonable and thus consonant with the Fourth Amendment. Kent

Simpson learned that guns, laptops, jewelry and other items were stolen from a local resident, Cynthia Phariss's, home. UMF No. 1; UMF No. 8 from Cotton County, [Doc. 86]; Sheriff Simpson visited the residence and took a statement and itemized inventory from Phariss, which listed several rifles as stolen. UMF 1; Affidavit for SW, COTTON 004-006. The ensuing investigation conducted by the Cotton County Sheriff's Office involved information about and interviews with a man in the community, Louis Slomba, who had been in the same car with Ricky Crank and Heath Teakell picking up guns and other items out of a ditch at night. UMF 1; UMF No. 8 from Cotton County, [Doc. 86]; [Affidavit for SW, COTTON 008-009].

Slomba was asked by both Ricky Crank and Heath Teakell to give them a ride to Rick's friend's place. After he dropped off Donna Devine, he proceeded with Teakell and Crank in the car. He started to go down a trail, dirt road at night, and Slomba asked where they were going. Teakell and Crank gave him instructions. All of a sudden, they told him to stop and pull a little farther. UMF 1; [Affidavit for SW, Ex. 2, and attachment COTTON 008-009] Crank and Teakell got out and started yelling at Slomba to help. Heath was in a ditch retrieving items, one of which was in a case. *Id.* Teakell said they were some guns and a bow and arrow and that he wanted to sell some of it, as he needed money. *Id.* Sheriff Simpson learned of these events through his investigation. UMF 1; [Affidavit for SW, Ex. 2], and through Mejia. UMF 2.

In fact, Crank and Teakell did sell two rifles to a resident, Kenneth Jay, that very night, a fact confirmed by the County's investigation. UMF 1, 8. Jay admitted to buying two such guns. UMF 1, 8. Sitting the car, Slomba saw the Crank and Teakell talking to a

man who lived near where the guns and items had been retrieved from a ditch, and after this conversation they reloaded stuff in the trunk.  UMF 1, COTTON 008-009

After this ditch-retrieval and sale episode, a shaken Slomba went home and told his girlfriend, Devine, what had occurred.  Slomba and Devine then took Teakell and Crank to the house owned by Sadie Teakell and where they often stayed, where the two unloaded the rest of the suspected stolen property. UMF 1;  [Affidavit for SW, Ex. 2, and attachment COTTON 008-009]   This information was given to Kent Simpson both by a local resident, Don Mejia, who received it from Slomba's girlfriend, Devine, and it was also given to Simpson by Slomba himself during his interview with Simpson.  *Id.*

After learning of the selling-off of stolen guns and the concomitant evidence and public safety issues this presented, the affidavit for search warrant was finished. Undersheriff Sparks communicated with Judge Flanagan on Saturday afternoon March 10, 2018, advising him of the investigation and the need to get a warrant.  UMF 39. Judge Flanagan advised they could come by later on that Saturday.  UMF 39.

One exception to the Oklahoma law rule of service of search warrants between the hours of 6:00am and 10:00pm is "The affidavits be positive that the property is on the person, or in the place to be searched and the judge finds that there is likelihood that the property named in the search warrant will be destroyed, moved or concealed."  22 O.S. § 1230(3).  The fact that guns, as stolen property, had already been sold suggests that the perpetrators would be trying to sell other stolen property, *i.e.* that such property will be in the process of being sold and moved or concealed. UMF 9.  This would be the analysis under the Oklahoma statutory exception.  UMF 9.  Indeed, Judge Flanagan testified that

this factor would thus qualify this particular investigation and search warrant, given its facts and circumstances, for nighttime service under Oklahoma law. UMF 9; UMF 13 from Cotton County MSJ, [Doc. 86].

Kent Simpson, as Sheriff, presented the affidavit for a search warrant for Sadie Teakell's residence in person to Judge Flanagan *very late* that same night that Sparks had talked to the Judge about the investigation and the need to present a warrant. UMF 39, 4. Simpson arrived at the Judge's house after 11:00pm on March 10, 2018. UMF 1, 4. The probable cause affidavit was <u>signed by the Judge at 11:41pm</u>, and the search warrant was signed shortly thereafter. UMF 4-5. The search warrant reads, "An Affidavit having been sworn...based upon facts stated herein…I command you to make **an immediate search** for the following described property and things…." UMF 6 (emphasis added). The affidavit requests "Day or night" service. UMF 4. The warrant itself, on its face, does not <u>expressly</u> restrict the service of the warrant to the day. UMF 3.

Further, Judge Flanagan testified that from the totality of the circumstances at the time, including the guns *already having been sold*, the late-night timing of the presentation and signing of the probable cause affidavit and search warrant, and the content of the two, that it is <u>highly likely</u> Kent Simpson thought that he had the Judge's approval for a nighttime search as he left the Judge's house that night. UMF 7. This conclusion stems (indeed, is ineluctable) from a consideration of all the pertinent circumstances viewed from a common-sense, practical perspective, which is the guiding approach to the question of nighttime search reasonableness, *supra*.

Additionally, information known to officers before the search warrant was served

bears upon the reasonableness of the manner of the service—here, conducting the execution of it at nighttime. The officers involved in the execution of the warrant knew the following: that a prior incident at the residence had occurred where Heath Teakell-- one of the suspects-- barricaded himself inside the outbuilding with a machete; that fighting had resulted in law enforcement interventions; that emergency orders of detention had been involved there; and that the Walters Police Chief ordered that no officer go alone to the residence due to the prior history with law enforcement. UMF 15.

Based on all of the facts and circumstances which are to be considered in the crucible of reasonableness, the execution of the warrant after it was signed by Judge Flanagan was objectively reasonable and thus comported with the Fourth Amendment.

## B. Governing Law Supports the Reasonableness of the Execution Timing

This Circuit has addressed a similar situation of nighttime service and found it reasonable. *United States v. Callwood*, 66 F.3d 1110, 1113 (10th Cir. 1995) states:

> When the officers asked for the warrant, they **approached the judge's home at 1:30 a.m.** The **affidavit clearly "request**[s] that the search be **allowed immediately**," and the search warrant explicitly makes the affidavit part of the warrant. Based on this information, the district court made a factual finding that the judge authorized a nighttime search. Consequently, under these circumstances, we find no error with the time of the search. Cf. United States v. Carhee, 27 F.3d 1493, 1498 (10th Cir.1994) (concluding that, although the search warrant did not explicitly state that the search could occur at night, no error occurred because the judge, in fact, authorized a nighttime search).

(emphasis added). The parallels here with *Callwood* are notable. Both situations involved a late-night visit to a Judge's home; both involved a request in the affidavit for "day or night" (here) or "immediate" (*Callwood*) service; both strongly point up the objective reasonableness, just in these circumstances alone, of a finding that the Judge

authorized a nighttime search.  *Even short of such a finding*, the execution of the warrant following the Judge's signing of the warrant was reasonable, all things considered. Further, we have here the connecting content of the affidavit ("day or night") with the search warrant ("immediate"), whereas the latter was lacking in *Callwood.*

Furthermore, the stark, uncontested reality of the evidence already having been sold and moved puts the reasonableness question beyond debate.  The fact that Oklahoma law sets out the exigent circumstances that justify service of a warrant after-hours, and this circumstance met such an exception, only highlights the plainly reasonable timing of the execution.  UMF 9; Cotton County UMF 13 [Doc. 86].  It squared with the rationale underlying the exceptions under Oklahoma law, presumably which reflect a legislative judgment of when it is <u>not only reasonable but necessary</u> for officers to disturb occupants of a residence after-hours.  Even if it did not, *arguendo*, meet Oklahoma law in this regard, the timing would still meet an objective reasonableness standard, but the *fact it does so comport* only cements the evaluation for Fourth Amendment purposes.

## IV.  EVEN IF MISTAKEN, SIMPSON IS ENTITLED TO QUALIFIED IMMUNITY ON THE NIGHTTIME SEARCH

Plaintiff is expected to argue that the search warrant itself did not authorize a nighttime search or that the Judge found fault with the way the search warrant was formatted and how the content was displayed, *etc*.  However, these points do not properly take account of the latitude afforded officials to make *perhaps* mistaken but nonetheless *reasonably mistaken* judgments.  *A.M. v. Holmes*, 830 F.3d 1123, 1139 (10th Cir. 2016).

### A.  Plaintiff Has The Qualified Immunity Burden

It has long been the law that once a defendant asserts a qualified immunity defense in a dispositive motion, the responsibility shifts to plaintiff to "meet a 'heavy two-part burden.'" *Case v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323 (10th Cir. 2007). "[T]o avoid judgment for the defendant based on qualified immunity, the plaintiff must show that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Toevs v. Reid*, 646 F. 3d 752, 755 (10th Cir. 2011). *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) states:

> '**If, and only if**, the plaintiff meets this two-part test does a defendant then bear the traditional burden…—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'

(emphasis added) (quoting *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008)).

Officers are protected in "close cases" by the doctrine of qualified immunity, which serves to protect law enforcement officers from the chilling threat of liability. *Swain v. Spinney*, 117 F.3d 1, 10 (1st Cir. 1997). Generally, there must be a Supreme Court or Tenth Circuit decision on point, or a clearly established weight of authority from other courts for the law to be clearly established. *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). A Defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating it. *Id.* "In other words,

'existing precedent must have placed the statutory or constitutional question beyond debate" and "[the Supreme Court] has repeatedly told courts…not to define clearly established law at a high level of generality since doing so avoid the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (emphasis added). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Crow v. Montgomery*, 403 F.3d 598 (8th Cir. 2005). *Gomes v. Wood,* 451 F.3d 1122, 1134 (10th Cir. 2006) states, "The law is clearly established if a reasonable official in the defendant's circumstances would understand that her conduct violated the Plaintiffs' constitutional right." See also *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) ("Perry must identify a case where an **official acting under similar circumstances** as [Defendant] was held to have violated the Constitution.") (emphasis added).

## B. *Arguable* Reasonableness In The Nighttime Execution Context

Even should the Court deem there to be a genuine dispute on the objective reasonableness of nighttime service, that does not also suffice for qualified immunity purposes. The Supreme Court in *Anderson v. Creighton*, 483 U.S. 635, 644 (1987) stated:

> We have frequently observed, and our many cases on the point amply demonstrate, the **difficulty of determining** whether particular searches or seizures **comport with the Fourth Amendment**…. Law enforcement officers whose judgments in **making these difficult determinations** are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law.

(emphasis added). The *Anderson* Court held, "Petitioner is entitled to summary judgment on qualified immunity grounds if he can establish as a matter of law that a reasonable

officer **could have believed** that the search comported with the Fourth Amendment **even though** it actually did not." (emphasis added). *Even if* the Court finds the execution at nighttime to have been inconsistent with the Fourth Amendment, Simpson certainly has made a showing he, or any reasonable officer, could have believed it was so consistent.

Although less common than cases attacking the probable cause for the issuance of a warrant or to support an arrest, the qualified immunity analysis for nighttime service is comparable to those cases and thematically similar. *Anderson v. Creighton*, 483 U.S. 635, 641 107 S. Ct. 3034 (1987) states, "The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a **reasonable officer could have believed** Anderson's warrantless search to be **lawful, in light of clearly established law and the information the searching officers possessed**." (emphasis added). As to affidavits for search warrants and probable cause, *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) states:

> 'First, we ask whether the officers had probable cause [to search the Plaintiffs' property]. If we conclude that probable cause was lacking, we then must determine whether [the plaintiff]'s rights were clearly established, which we approach by asking whether the **officers arguably had probable cause**." …Arguable probable cause exists where "a **reasonable police officer in the same circumstances**… and possessing the same knowledge as the officer in question **could have reasonably believed that probable cause existed** in light of well-established law.'

(emphasis added) (internal citations omitted). *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007) states, "Even law enforcement officials who **reasonably but mistakenly** conclude that probable cause is present are entitled to immunity." (emphasis added). *Garcia v. Escalante*, 678 F. App'x 649, 655 (10th Cir. 2017)(unpub) explains:

As a practical matter, we implement this [clearly-established-law] standard by asking **whether there was 'arguable probable cause'** for an arrest—if there was, a defendant is entitled to qualified immunity.' In other words, in the § 1983 qualified-immunity context, an officer may be **mistaken about whether he possesses actual probable cause** to effect an arrest, so long as the **officer's mistake is reasonable**—*viz.*, so long as he possesses 'arguable probable cause.'

(emphasis added)(citing, *inter alia, A.M. v. Holmes*, 830 F.3d 1123, 1139 (10th Cir. 2016)).   Arguable reasonableness for the nighttime search is the corollary here.

Notably, this inquiry is not to be conducted via hindsight with the knowledge of future events.  It is to be disciplined to the "same circumstances…and same knowledge as the officer in question" at the time.  *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991)("…[A] determination whether…search was 'objectively legally reasonable ... will often require examination of the information possessed by the [arresting or] searching officials.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)).

*Salmon* further provides:

We must decide whether the defendants **could have believed**, under the *Burns* standard of objective reasonableness,' **that probable cause existed** for the issuance of Salmon's arrest warrant.

*Id.* at 1136 (emphasis added).  Objective *un*reasonableness is a high standard.  It cannot be said that a reasonable officer in Simpson's shoes, simply could NOT have reasonably believed cause existed for the nighttime service under clearly established, federal law.  All of the circumstances discussed above strongly depict a reasonable belief in nighttime service being constitutionally proper in that specific instance, or *at the very least* **not being clearly established** as constitutionally improper—under the framework applicable to the qualified immunity analysis and associated burdens.  Plaintiff cannot carry his

burden under either prong, and Simpson is entitled to qualified immunity.

### V. EVEN IF UNCONSTITUITONAL, THE TIMING OF THE SEARCH BEARS NO VALID, CAUSAL LINK TO DEATH OF COOPER

It is well established that personal participation is the *sine qua non* of Section 1983 liability, as there is no *respondeat superior* liability. "Because vicarious liability is inapplicable to….§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," states *Ashcroft v. Iqbal*, 556 U.S. 662, 676 129 S. Ct. 1937 (2009). It is expected that Plaintiff, having not pled excessive force against Kent Simpson, would still seek to hold him "responsible" under some rationale. This bid fails as a matter of law.

It is undisputed that Kent Simpson did not physically touch Dudley Cooper **at all** during the pertinent time period after entry of the residence and before the occupants were secured. UMF 26. Kent Simpson gave no directions or orders to any of the officers to either use force or to do so in a certain way, should such contact be necessary during the process. UMF 18. Kesto Simpson made his own decision, using his own law enforcement experience and training given the circumstances at the time, that a measured use of force was warranted, and he decided what technique to use. UMF 19-21.

Kent Simpson did not cause any use of force. Any loose allegations that he was "in charge" or it was "his show" are simply thin verbiage that do not comport with Section 1983 strictures. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007) (police officer who was present at scene who did not assist or direct other officer in removing arrestee from vehicle did not violate Fourth Amendment; he did not

"personally participate" in the use of the twist-lock restraint).

Simpson did not participate in or direct any use of force against Cooper.  Courts have been clear that a plaintiff cannot simply link an officer at the scene to the particular use of force resulting in injuries.  Surveying relevant law, *Vinson v. City of Los Angeles*, CV 14-4488-PLA, 2015 WL 12750271 (C.D. Cal. May 19, 2015) states:

> See, e.g., *Hopkins v. Bonvicino*, 573 F.3d 752, 769–70 (9th Cir. 2009) (noting the Ninth Circuit had "rejected the 'team effort' standard" and that an officer "[b]eing a mere bystander [to his colleagues' conduct] was insufficient to support § 1983 liability" (some internal quotation marks omitted)), cert. denied, 559 U.S. 1048 (2010); *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002) ("We reject the idea that **mere presence at a search** or membership in a group, **without personal involvement in and a causal connection to** the unlawful act, can create liability under section 1983.")

(emphasis added).  Further, merely applying a retroactive label to Simpson does not suffice to show personal participation.  *Smith v. LePage*, 834 F.3d 1285, 1299 (11th Cir. 2016)("[T]here are no facts suggesting that he either directed the officers to act unlawfully or knew they would.").  Simpson gave no direction at all as to use of force upon any occupants. UMF 18.

In contrast to the facts here, *Estate of Booker v. Gomez,* 745 F.3d 405, 422 (10th Cir. 2014) provides the following factual scenario:

> First, all Defendants **actively participated** in a **coordinated use of force** on Mr. Booker: Deputy Grimes applied the carotid hold; Deputy Gomez helped handcuff Mr. Booker; Deputy Robinette handcuffed him and applied pressure to his back;.. If excessive force occurred, all deputies contributed to it. See *Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir.2011) ( '[A] police officer may be responsible for another officer's use of excessive force **if the officer ... actively participated in the use** of excessive force.'…Because the Defendants here **engaged in a group effort**, a reasonable jury could find them liable for any underlying finding of excessive force.

(emphasis added).  This was far from the case during the subject search.  *Vinson* 2015 WL 12750271 at *8 states "(a court's 'inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation')." (quoting *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  As to Kent Simpson's actions specifically, there is no valid causal link to Cooper's death as a matter of law.

There can be no Section 1983 death damages from an illegal entry alone.  Such a finding would be effectively *assuming* a loss of life would occur from EVERY service of a search warrant at night.  Even if the Court finds a triable issue with any illegal entry claim, the damages for that claim would be dignitary in nature and NOT extend to any physical injury sustained by Cooper by way of any use of force by other officers.   There is no proper causal link between any alleged invalid nighttime service of a search warrant and Cooper's physical injuries.  The "injury" for the former would be dignitary, abstract and nominal, and the latter injury is much different in all respects and not encompassed by the former.  *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) provides:

> Federal common law principles of tort and damages govern recovery under section 1983. See *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)…It is axiomatic that where several independent actors concurrently or consecutively **produce a single, indivisible injury**, each actor will be held jointly and severally liable for the entire injury.

(emphasis added).  The "injuries" in question would not be single and would already be divided and separate; any attempt to fuse them together would be specious.

Lastly, qualified immunity also prevents the kind of cross-threading inherent in seeking to hold someone theoretically responsible for an action that occurred in a later

sequence of events, apart from the that defendant's own actions. *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1777 (2015)

> Qualified immunity necessarily applies here because, as explained above, competent officers could have believed that the second **entry was justified** under both continuous search and exigent circumstance rationales. Indeed, even if Reynolds and Holder **misjudged the situation**, Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation **that could have been avoided**.'

(emphasis added). If any illegal entry claim survives, Defendant is entitled to Judgment that such claim would not be tied to Section 1983 death damages as a matter of law.

## VI. SIMPSON WAS NOT DELIBERATELY INDIFFERENT TO ANY MEDICAL NEED OF COOPER'S

For efficiency, Defendant Simpson hereby incorporates Kesto Simpson's Motion [Doc. 93, ECF pg. 21] regarding the well-known deliberate indifference standard, and the Tenth Circuit's recent buttressing of such standard under the Fourteenth Amendment in Strain v. Regalado, 977 F.3d 984 (10th Cir. 2020)

Personal participation is an essential allegation in a civil rights action. *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976). See *Kentucky v. Graham*, 473 U.S. 14159, 166 (1985). *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) counsels, "Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group."

Plaintiff's denial of medical claim against Kent Simpson is devoid of any evidence regarding his assessment of Mr. Cooper, his awareness or any actions of Simpson that are part of the medical response to Cooper. Rather, the record shows that Kent Simpson was busy clearing and searching the house when Kesto Simpson was in the room with and

monitoring Cooper.  UMF 27-32.   It was Kesto that saw Cooper become unresponsive, after earlier complaining about his handcuffs, and Kesto then immediately ordered for an ambulance to be called.  [Affidavit of Kesto S., ¶¶ 46-49].   Kent Simpson was not with Kesto during this period of time when Kesto was with Cooper.  *Id*; UMF 27-32.

Kent Simpson did not sufficiently personally participate in the medical care situation with Cooper, either in closely observing Cooper during the execution or in deciding what to do when a medical need was discerned by Kesto. [Affidavit of Kesto S., ¶¶ 46-49].  *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007)(mere presence at the scene is not enough to establish liability).  For liability under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established. *Novitsky*, 491 F.3d at 1254. *Coleman v. Turpen*, 697 F.2d 1341, 1346 n.7 (10th Cir. 1982) ("Prosecutor Turpen, to be liable, must have been personally involved in the deprivation.")  For this reason alone, Simpson is entitled to judgment on Plaintiff's denial of medical claim.

Even if, *arguendo,* Plaintiff could present record evidence of Simpson's personal involvement, Plaintiff's deliberate indifference claim would still fail. The Tenth Circuit has been clear that there is no constitutional duty to render medical aid to an arrestee once a need was discerned and qualified medical aid was then summoned.  *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996).  In *Wilson*, after a police officer shot a man holding a gun, other officers had the shooting victim handcuffed before medical help arrived. From there, the officers did not administer medical care of first aid before emergency medical technicians arrived.  *Id.* The Tenth Circuit held that neither the handcuffing nor

the refusal to remove the handcuffs amounted to a constitutional violation, and Defendants were not deliberately indifferent in calling and awaiting specialized medical help from paramedics. Plaintiff presses similar claims here, i.e. that Kent Simpson, as one of the officers in the house, failed to provide some form of medical care to Cooper after an awareness had arisen (in someone else) and after an ambulance had been called (by someone else). **Even if** Simpson's personal participation and subjective awareness could somehow be shown, this claim stands barred by *Wilson* as a matter of law and via the clearly established law prong.

This principle, germane to officers during a search or seizure field situation and a denial of medical claim, was recently reaffirmed in *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 802 (10th Cir. 2019)(unpub), which states, "There is no precedent supporting the notion that police officers have an affirmative duty to provide immediate medical care in situations such as the instant case." (citing *Wilson v. Meeks*, 52 F.3d 1547, 1556 (10th Cir. 1995)) *abrogated* on other grounds by *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001). *Crittenden* was decided on the clearly established inquiry of qualified immunity. In this respect, *Crittenden* notes, "Nothing has changed since *Wilson*." *Id.* at 803. Further, it is Plaintiff's burden to identify qualifying cases with specific, factual analogs to satisfy the clearly established prong. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Courts "must frame the constitutional question with specificity and granularity." *Morrow v. Meachum*, 917 F.3d 870, 874-75 (5th Cir. 2019)

Plaintiff's claims of denial of medical care are enveloped and barred by *Crittenden*, given the factual parallels between the two cases. Here and in *Crittenden,* the

claims were that officers injured the plaintiff, and after this injury "did nothing to assist him (e.g. check his vitals or perform CPR)." *Id.* at 802. Both *Wilson* and *Crittenden* show that the law was not clearly established that officers must, without any specialized medical training, perform *some form* of medical care when they knew the trained professionals were already *en route* by ambulance. *Crittenden* states:

> '[T]he first duty of a police officer is to ensure the safety of the officers and the public.'). Likewise, given the nature of the gunshot wound to Crittenden's head, Meeks suggests medical intervention of any type on the part of the individual officers might be counterproductive….('Few citizens would be likely to want police officers to render medical aid. Such steps are best left to the qualified and highly trained personnel who act as paramedics or EMTs.')

*Id.* at 804 (quoting *Wilson*, 52 F.3d at 1555-56). Similarly, Kent Simpson's impression, from the circumstances, was that Cooper was breathing, and Kent did not have the kind of medical training to qualify him to diagnose and treat unknown, internal injuries. UMF 35, 36. This is why he relied on the professionals on the way via summoned ambulance.

Even if Plaintiff can a triable issue that Kent Simpson was close enough to have any subjective awareness of a serious medical need, he certainly cannot establish any **conscious disregard** of it. It is undisputed Kent Simpson quickly responded, either being assured an ambulance had been called or directing that one be called immediately. UMF 33. *Choosing to act* in response to a risk or serious need actually perceived, but choosing the wrong action, in hindsight, is the province of negligence. It is not consonant with a denial of care or deliberate indifference. Plaintiff cannot show that Simpson's actions violated clearly established law particularized to the circumstances facing Kent Simpson as to Cooper's condition during the process of the search warrant execution.

Plaintiff makes allegations relative to a lengthy delay of "nearly two hours after he was knocked unconscious." [Doc. 1, ¶¶ 25-26]. However, these allegations were made before discovery and markedly conflict with the record, undisputed evidence in this case. *Colony Nat. Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005 at *1 (D. Kan. June 2, 2008)(unpub) states: "The non-moving party cannot avoid summary judgment by repeating conclusory opinions, **allegations unsupported** by specific facts, or **speculation**." (emphasis added)(citing *Argo v. Blue Cross & Blue Shield of Kansas, Inc.,* 452 F.3d 1193 (10th Cir. 2006)). This much is evident from Fed.R.Civ.P. 56(c), which requires a party a movant's bid to cite to "particular parts of materials in the record." Plaintiff "must respond with specific facts showing the existence of a genuine factual issue to be tried." *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980). Additionally, Plaintiff alleges Simpson, and others, "failed to seek any medical care or treatment for Dudley for a period of more than one hour." [Doc. 1, ¶ 39]. This is just bald allegation contravened by undisputed material facts as record evidence.

Plaintiff has shown neither an actionable delay nor any harm from the same. For the timing of the calling and response of EMSA, See Cotton County MSJ, [Doc. 86], incorporated herein. Further, there is no evidence Kent Simpson subjectively appreciated Cooper's medical need **and** consciously disregarded it after becoming aware of it. Gatekeeper liability may arise only when that person "delays or refuses to fulfill that gatekeeper role due to deliberate indifference" after a subjective awareness has arisen. *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000); see also *Blackmon v. Sutton,* 734 F.3d 1237 (10th Cir. 2013); *McCowan v. Morales*, 945 F.3d 1276 (10th Cir. 2019).

## VII. KENT SIMPSON IS ENTITLED TO QUALIFIED IMMUNITY ON THE DENIAL OF MEDICAL CARE CLAIM

The Tenth Circuit has recently confirmed that district courts must use a more specific and less generic approach to determining qualified immunity. *Aldaba v. Pickens*, 844 F.3d 870, 872 (10th Cir. 2016); See *also Garcia v. Escalante*, 2017 WL 443610, *4 (10th Cir. Feb. 2, 2017); *Youbyoung Park v. Gaitan*, 2017 WL 782280, *9 (10th Cir. Mar. 1, 2017); *Moore v. Roberts*, 2017 WL 1906953, *6 (10th Cir. April 17, 2017). *Pauly v. White*, 874 F.3d 1197, 1223 (10th Cir. 2017)(*Pauly* III), See also *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1215-15 (10th Cir. 2019).

Here, there is not a qualifying case of sufficient similarly to the particular situation that unfolded at the subject residence as concerns Kent Simpson and any alleged flaws in medical care response, which case would have clearly established the law ***despite* Wilson** and *Crittenden.* Even, arguendo, should the Court find Wilson and Crittenden did not control, the dearth of other, applicable cases signifies the lack of clearly established law.

There was no clearly established law that would have informed Simpson, in the circumstances of the moment, that, in his limited viewing of Cooper, calling for an ambulance and/or relying on trained medical professionals en route would violate Cooper's constitutional rights. Simpson did not have the kind of training to qualify him for diagnosing and treating internal, unknown conditions in a field situation. UMF 36. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Crow v. Montgomery*, 403 F.3d at 602. Plaintiff cannot carry his burden on the clearly established prong of qualified immunity or the first prong either, *supra.*

Respectfully submitted,


s/ Carson C. Smith
Carson C. Smith, OBA #22303
Robert S. Lafferrandre, OBA #11897
PIERCE COUCH HENDRICKSON
   BAYSINGER & GREEN, L.L.P.
1109 N. Francis Avenue
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
csmith@piercecouch.com
rlafferrandre@piercecouch.com
*Attorneys for Defendant Kent Simpson*

## CERTIFICATE OF SERVICE

   I hereby certify that on this 1st day of December 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Barrett T. Bowers | btb@fastmail.com |
| Bret T. Burns | bret.burns@ymail.com |
| Preston M. Gunkel | preston@gunkellawgroup.com |
| Stanley M. Ward | rhonda@wardglasslaw.com |
| Woodrow K Glass | woody@wardglasslaw.com |
| Tanner B. France | tanner@wardglasslaw.com |
| Scott B. Wood | okcoplaw@aol.com |
| Stephen L. Geries | slg@czwlaw.com |
| Taylor M. Riley | tmr@czwlaw.com |
| David D. Proctor | dproctor@gphglaw.com |
| Seth D. Coldiron | scoldiron@gphglaw.com |

               s/ Carson C. Smith

               Carson C. Smith